L. B. GRIFFITH ET AL. V. F. R. ALLISON ET AL.

No. 6602.   Decided July 15, 1936.
Rehearing overruled October 14, 1936.
(96 S. W., 2d Series, 74.)

*Boone & Raymer* and *Allen V. Davis,* all of Corpus Christi, for plaintiffs in error.

The evidence conclusively established complete abandonment of the alleged dedication and easement, if any ever existed. City of Galveston v. Williams, 69 Texas, 449, 6 S. W., 860; City of San Antonio v. Sullivan, 57 S. W., 42; Carpenter v. Graber, 66 Texas, 465, 1 S. W., 178; State v. Travis County, 85 Texas, 435; 21 S. W., 1129; City of Houston v. Flinnigan, 85 S. W., 470.

*Kleberg & Eckhardt, John C. North, R. T. Pritchett,* all of Corpus Christi, *Swearigan & Miller,* of San Antonio, *Robert W. Stayton,* of Austin, for defendants in error.

Because the proposed city did not materialize was not a failure or abandonment of the entire dedication, since the undisputed and settled law of Texas is to the effect that dedications of this sort may lie quiescent for years until development justifies their use. City of Corsicana v. Zorn, 97 Texas, 317; 78 S. W., 924; Lamar County v. Clements, 49 Texas, 347; Sanborn v. City of Amarillo, 93 S. W., 473.

MR. JUDGE GERMAN delivered the opinion of the Commission of Appeals, Section A.

Defendants in error, F. R. Allison, L. Kaffie and W. F. Harris, who will be referred to herein as plaintiffs, instituted this suit in the District Court of Nueces County against plaintiffs in error, L. B. Griffith and wife, Illse Griffith, C. G. Sanford and wife, Lucile Sanford, M. C. Gann and W. E. Pope, who will be referred to herein as defendants. Plaintiffs sought to obtain a permanent injunction against defendants restraining them from in any manner obstructing or interfering with the free use of a certain park or parkway which they claimed was a part of what was at one time designated "Port Aransas

Cliffs," a subdivision fronting on Corpus Christi Bay and lying immediately south of the City of Corpus Christi. There was also a prayer for a mandatory injunction requiring defendants to remove all fences and other obstructions from this parkway. Plaintiffs at first sought an injunction with reference to what was designated in their petition as "Ocean Drive," but later dismissed the suit as to this drive and confined it solely to the parkway. They obtained the relief prayed for in the district court, and the judgment of this Court was affirmed by the Court of Civil Appeals. 60 S. W. (2d) 899.

In the year 1889 one E. H. Ropes conceived an ambitious plan of establishing a pretentious city adjoining the City of Corpus Christi and fronting on Corpus Christi Bay. To that end he entered into contracts with Matthew Dunn and Prokop Hoffman for acquisition of the lands upon which this city was to be builded. Generally speaking, these contracts provided that Dunn and Hoffman would convey certain lands to Ropes, who would on his part have same surveyed and subdivided into lots, blocks, streets, parks, etc., and made ready for sale to the public. Ropes on his part further undertook to build within the proposed city a hotel, a line of railroad for steam or horse cars, to build a driveway along the bluff and make other minor improvements. Provision was also made for setting aside grounds for race track and for amusement pavilion. After these things were done, Dunn and Ropes were to select alternative blocks within the city, so far as lands provided by Dunn were concerned, and Hoffman and Ropes were to select alternative blocks in the city so far as lands furnished by Hoffman were concerned. According to agreement of the parties these contracts were satisfactorily performed, as Ropes is agreed to be the common source of title so far as the lands claimed by plaintiffs and defendants are concerned. The contracts referred to provided that the map of lands to be prepared by Ropes should include among other things "a park running along the entire front of the bluff or bay so far as our several lands extend. Also a boulevard along the inner edge of said park and avenue to average not more than 150 feet wide." The entire acreage to be included in this subdivision extended along the bay front a distance of about three miles and back from the bay a distance of about one mile, and contained approximately 1500 acres.

In pursuance of his agreement Ropes employed C. F. H. von Blucher, a civil engineer and then County Surveyor of Nueces County, to subdivide the lands acquired under the Dunn

and Hoffman contracts, as well as certain tracts acquired under contracts with Uriah Lott and O. C. Lovenskiold, and make a map or plat of such subdivision. After making several preliminary maps or plats, Blucher delivered final map to Ropes sometime about July, 1889. This original map was not found, but we are of opinion that the copies of maps offered in evidence showed with substantial accuracy all that appeared upon the original map. This original map was entitled "Map of Port Aransas Cliffs, Nueces County, Texas." It was very elaborately prepared and showed more than 1700 blocks, with many streets and avenues running generally east and west and north and south and several avenues running diagonally through the general plan. There were some four or more wide avenues of approximately 200 feet in width. There were several circular park areas at the intersection of various streets and avenues. The lots were not designated on the plat, but apparently the blocks were to consist of 64 lots each.

The original map adopted by Ropes appears to have been filed for record in Nueces County October 14, 1889. One of the copies offered in evidence was made by J. S. Peters September 19, 1891, and purported to have been a correct copy of the map filed October 14, 1889. Another map offered in evidence was taken from an office once occupied by Ropes, being a wall map of immense size, and in our judgment was a duplicate of the original. On the Peters map there appears a strip of land approximately three miles in length lying between Blocks 4 to 21 and the margin of Corpus Christi Bay, and approximately 300 feet in width. This strip of land is designated on the map "Ocean Drive," and near the middle of same and running its full length is a dotted line. Almost exactly in the middle of the strip, between the blocks of land reserved for the hotel site and the bay front, is the word "Park." Nowhere else upon this map does this word appear. Blucher testified that on his preliminary maps the strips of land along the bay front was marked by him in several places "Parks." However, before making his final map Ropes stated to him that when a park was turned over to the public it was usually neglected and became a detriment to adjoining property, and for that reason he wanted to reserve the control of this strip. Blucher thereupon put on the final map the word "Private" above the word "Park" where it appeared. On the large wall map offered in evidence the words "Private Park" appear some four times upon the strip of land lying adjacent to the bay front.

All doubt, however, as to the exact nature of the easement

intended to be created in this strip of land is removed by the provision contained in a deed by Ropes to Port Aransas Company dated July 17, 1889, some three months before the original map was filed for record in Nueces County. The Port Aransas Company was a corporation, of which Ropes was president, and apparently was created to take over the title to the property and become the agency through which sales were to be made. This deed conveyed a great many of the blocks shown on the map entitled "Map of Port Aransas Cliffs, Nueces County, Texas," and then conveyed the following:

"A strip of land 300 feet wide upon the average lying between the easterly line of Block 4 to 21 inclusive and the waters of Corpus Christi Bay, as the same appears upon said map, said strip being about 3 miles in length and the same to be used exclusively for a free public park and pleasure ground for the people and to be under the exclusive care of said Port Aransas Company. If the said company or any other corporation or corporations or person or persons shall ever divert such proposed park to any other uses whatsoever then so much of such park as is so diverted shall revert to myself or my legal representatives."

Plaintiffs in this suit hold title to certain blocks and parts of blocks designated upon the map of Port Aransas Cliffs. The lands claimed by them apparently all adjoin what was originally shown on the map as "Ocean Drive." The title of plaintiff Allison appears to have originated with a deed from E. H. Ropes to J. B. Mitchell dated December 15, 1890, and with deeds by devisees and heirs of E. H. Ropes, the earliest of which was in 1912. The title of all other plaintiffs appears to have originated with a deed by J. C. Ward to E. H. Ropes dated March 11, 1891, with reservation of vendor's lien. The numerous blocks conveyed by that deed are referred to as being "shown on a map entitled the 'Hoffman Tract' made by C. F. H. v. Blucher, County Surveyor of Nueces County, Texas." It is significant to note that the vendor's lien retained in this conveyance was foreclosed in November, 1892, and these lands were reconveyed to Ward by sheriff's deed dated February 11, 1893. In the sheriff's deed and subsequent deeds the blocks are referred to as being in "what is known as Port Aransas Cliffs, Nueces County, Texas, according to map or plan of said Port Aransas Cliffs made by C. F. H. v. Blucher."

The title of defendants to the portions of the so-called Parkway is claimed through E. H. Ropes, Matt Dunn and Port

Aransas Company, on the theory that this Parkway, if ever dedicated, reverted to these parties.

Plaintiffs are basing their right to equitable relief on the well-settled general proposition that when the owner of land lays out and establishes a town or subdivision, and makes and exhibits a map or plan of same, upon which streets, parks, public squares, etc., are delineated, and sells lots with reference to such map, the purchasers acquire as appurtenant to their lots all rights, privileges, easements and servitudes represented by such map or plant to belong to them or to their owners; and that the sale and conveyance of lots according to such map implies a grant or covenant, for the benefit of the owners of the lots, that the streets and other public places represented by the map shall never be appropriated by the owner to a use inconsistent with that represented by the map on the faith of which the lots were sold. They further contend that a dedication once definitely made as a result of the sale and conveyance of lots with reference to a map is irrevocable, and that the right or easement obtained by a purchaser is a different interest from that obtained by the municipality in streets and other public portions of the enterprise dedicated to the public generally.

Defendants are making the contention in substance that there never was an effective dedication of this parkway, but if there was, the rights therein acquired by plaintiffs' predecessors in title by reason of purchases made with reference to the map, if any, have been lost as a result of abandonment; and that as the purpose for which this alleged dedication was intended has failed, the fee to this parkway reverted to their predecessors in title and has been acquired by them through due conveyances.

█ We are of the opinion that there was a clear purpose and intention to make a limited and conditional dedication of the strip of land designated "Ocean Drive," and that this strip included as a part of same the so-called parkway. We are further of the opinion that no formal acceptance of such offer of dedication was necessary, but that if purchases of lots were made with clear reference to the map, and before the proposed town collapsed, the vendees obtained as incident to their purchases an easement or right separate and distinct from the right or easement tendered to the public generally. This right or easement, however, was itself clearly subject to the conditions attached to the dedication by the dedicator, and to such conditions as were inherent in the general scheme of which the dedi-

cation of a park or parkway was but a minor enterprise or feature.

It is our opinion that the record clearly discloses that the entire strip of land upon the map in question along the bay front and approximately 300 feet in width was intended to be "Ocean Drive." The Peters map discloses a cross section through "Ocean Drive," and this cross section clearly shows that the drive consisted of a walk 20 feet in width, then a carriageway of 120 feet in width, then a "bridge way" through the middle 20 feet in width, and then a parkway 140 feet in width. Comparing this cross section with the cross section of the 200-foot avenues it is seen that the purpose was to separate the walk from the carriageway with a row of trees, or evergreens, and then to have a double row of trees or evergreens through the middle of the drive, 20 feet apart, making what was shown on the advertising literature as a "bridle path," rather than a "bridge way." Then from the bridle path to the water's edge was to be what was designated as "Park." There can be no doubt, it seems to us, that this entire strip was intended to be regarded as a unit and as a whole was to be used for walking, driving, riding, and for pleasure purposes. In the deed of conveyance by Ropes to Port Aransas Company it is described "as a strip of land 300 feet wide upon the average lying between the easterly line of Blocks 4 to 21, inclusive, and the waters of Corpus Christi Bay, as the same appears upon the said map, said strip being about three miles in length, the same to be used exclusively for a free public park and pleasure ground for the people."

This dedication, however, was clearly upon the condition that this strip of land was to be under the exclusive care of the Port Aransas Company, or some person or agency responsible for its care and preservation for the purpose for which it was intended. A dedicator may attach to a dedication such conditions as to him may seem proper, so long as they are not repugnant to the grant. Ropes, therefore, clearly had the right to prescribe, as he manifestly intended to do, that the care and control of this strip of land should at all times be in some person or agency, although its use should be for the general public.

■ We are further of the opinion that it was not intended to merely dedicate a park and pleasure ground for the free use of the public generally, but the intention was to dedicate such park and pleasure ground as an essentially constituent and integral part of a larger enterprise, towit, as a part of an ex-

isting, populated, growing and thriving town or addition, whose inhabitants, as such, were primarily to be the beneficiaries of the dedication.

It appears to be well-settled that an abandonment, even of an easement acquired by purchase, occurs when the use for which property is dedicated becomes impossible, or so highly improbable as to be practically impossible, or where the object of the use for which the property is dedicated wholly fails. Dickinson v. Arkansas City Imp. Co., 77 Ark., 570, 92 S. W., 21, 113 Am. St. Rep., 170; Town of Glasgow v. Matthews, 106 Va., 14, 54 S. E., 991; Mason v. Wall, 96 W. Va., 461, 123 S. E., 457; Campbell v. City of Kansas, 102 Mo., 326, 13 S. W., 897, 10 L. R. A., 593; Gaskins v. Williams, 235 Mo., 568, 139 S. W., 117, 35 L. R. A. (N. S.), 603; Porter v. International Bridge Co., 200 N. Y., 234, 93 N. E., 716, 21 Ann. Cas., 684; Blank v. Borough of Haddonfield, 96 N. J. Eq., 641, 126 Atl., 300; State v. Hamilton, 109 Tenn., 276, 70 S. W., 619; Chapin v. Lake, 116 Va., 364, 82 S. E., 89; 18 Corpus Juris, p. 123, Sec. 160.

The courts sometimes put the matter conversely by saying that there will be no reverter to the dedicator when the use to which the property is dedicated can be enforced by an application to equity to compel a specific performance of the trust.

■ Looking at the matter from the standpoint of the dedicated strip alone it seems to us evident that the dedication has failed because of the impossibility of its execution. There is no contention that this strip of land was ever opened and actually dedicated to the uses intended. It appears that the portion of the strip designated as "Park" has never been used as such, but at times it has been partly under fence, has been partly covered with brush, has had houses on same at different places, and has been used in a desultory way for fishing and other purposes. By order of the commissioners court of Nueces County all of this strip which the parties have designated as "Ocean Drive" was abandoned for public highway purposes except a strip of 60 feet in width. This 60 feet has been appropriated to road purposes and a paved highway is maintained thereon for a distance of nearly three miles. Plaintiffs have by their pleadings and admissions abandoned the suit as to all of the 300-foot strip except the part shown on the cross section as a parkway. As indicated above, we think the 300-foot strip was regarded as a unit and the purpose of the dedicator cannot be accomplished simply by trying to preserve only that portion of the strip designated "Park." Manifestly, the opening and

maintaining of the 300-foot strip in the manner and for all the purposes intended cannot now be accomplished by an attempted specific performance. There is no one to be charged with the "exclusive care" of this strip as a walk, driveway and pleasure ground. To merely keep portions of the parkway open so that plaintiffs may pass over same to reach Corpus Christi Bay would not be effectuating the full purpose and intention of the dedicator.

But looking at the matter from the broader viewpoint, and considering the attempted dedication of the 300-foot strip as only a feature of a larger enterprise, we think there are other substantial reasons why plaintiffs are not entitled to equitable relief. The scheme which Ropes sought to accomplish included the establishment of an extensive city. There were hundreds of blocks with many streets and avenues. If this dream had become real, there would have been not only a necessity for this Ocean Drive but it would have contributed immeasurably to the value of all other portions of the enterprise. In turn, there would have come into existence a municipality or community with a population sufficiently large and interested that suitable and adequate provision could have been made for the care and preservation of the "Drive" in a manner within the reasonable contemplation of the dedicator.

It appears true, however, that this was what is usually designated by the decisions as a "paper city." It can safely be said, in light of all the testimony, that this experiment, practically in its entirety, collapsed shortly after its inception. A witness who had lived in Nueces County since 1889, and who was familiar with the enterprise, testified, without objection, that with the coming of the drouth in 1892, the whole plan of building a big town "blew-up," and everything was abandoned by Ropes and his associates. The Port Aransas Company apparently very soon after its organization became insolvent. A portion of the proposed city which had been carved out of lands acquired by Ropes from Uriah Lott was lost by foreclosure of the vendor's lien. In 1890 contract was made for construction of a hotel and a lien was created on a large block of land. Shortly thereafter the lien was foreclosed and title to this portion of the land passed out of Ropes and the Port Aransas Company. As noted above, most of the blocks of land now owned by plaintiffs were acquired by Ropes under a deed which reserved a vendor's lien. This lien was foreclosed in 1892 and the title to all these blocks passed out of Ropes and the Port Aransas Company. So far as disclosed by the record there

were only a few sales made with reference to the map, and they were of blocks rather than of lots, thus indicating that the land was being considered as acreage and not as city property. It is undisputed that by various orders of the commissioners court of Nueces County a great many of the streets and avenues as well as park areas shown upon the map have been vacated as public streets and the lands have been thrown back into acreage. In addition, large portions of this proposed city have been subdivided a second time, and new additions created, with plans of lots, blocks, streets and avenues different from those shown upon the original map of Port Aransas Cliffs. We infer from the record that lots have been sold in these new additions. Large sections of this proposed city have been under fence and have been used at different times for farming and pastures purposes. In the chain of title under which some of the plaintiffs claim there are recitals which showed that the lands conveyed were under fence, or partly under fence, and were being used for farming purposes. Counsel for plaintiffs, in their effort to exonerate their clients from the charge of having misused portions of the dedicated property, say:

"One set of facts stands out in the evidence most prominently: Ropes and his successors did not sell the lots separately; they sold groups of lots. It was by wholesale, instead of by retail as had been originally intended. A few streets only were actually opened and used by the public, for instance, Santa Fe. The rest were never opened, and remained, except on maps and in deeds, indistinguishable from the surrounding territory. Long before any of these present parties acquired their titles to the lots previous owners had commonly enclosed their blocks, lots, and the internal streets with fences, and raised live stock and farmed thereon. For instance, the Fergusons had conducted a live stock business on the lots afterward acquired by Kaffie and by Allison. Somewhere in the Texas cases we have read that until platted streets are opened, it is within the right of abutters to use them. This thing had gone to further extent than mere non-user of these streets by the public. The Commissioners Court, though doubtless in contrariety to the Constitution, had ordered numbers of these unopened streets to be closed and had even declared the resultant areas to be acreage property."

We are of the opinion that this testimony, as a whole, discloses such a complete abandonment of this proposed enterprise in all of its essential features as amounted to a destruction of

the general scheme and purpose. This being true, a condition exists where the "object of the use for which this property was dedicated wholly fails."

In the case of Town of Glasgow v. Matthews, supra, the facts did not show such a complete abandonment of the proposed town as is shown in this case, yet the court said:

"The general purpose of the dedication has failed, the property has been sold and purchased with a view to changed conditions, and these circumstances, coupled with the continuous failure of the public during all these years to open and maintain these streets, together with the systematic diversion of the land included in them to uses foreign to the dedication, all furnish unmistakable evidence of their abandonment."

We may appropriately add here that while the acts of plaintiffs in fencing their lands and disregarding the streets and avenues as originally designated on the plat may not within themselves be sufficient to prevent equitable relief in their favor (which we do not decide), yet they are strong confirmatory evidence of the prior abandonment and consequent collapse of the plan for a city. In the case of Dickinson v. Arkansas City Imp. Co., supra, the court said:

"It has been often said that the fact of dedication depends wholly upon the intent, as manifested by open and visible acts, to appropriate the land to public use; and it is equally true that the fact of revocation by abandonment depends upon the intent, as manifested by open and visible acts, to abandon the purpose in furtherance of which the dedication was designed."

In the case of Mason v. Wall, supra, it was held as follows:

"The right of easement in the streets and alleys of a proposed town passing to a lot owner may be lost by abandonment, when the plan for the town has failed."

We conclude that so far as the so-called parkway is concerned the proposed dedication was never consummated, because the general plan and enterprise of which it was a part collapsed in the early period of its attempted formation.

There are expressions by the trial court shown in the record which indicate that it was his view that the dedication, by reason of the map and sale of blocks, was irrevocable, and the issue of abandonment of the proposed town was immaterial. For this reason, a finding of fact that the enterprise did not fail will not be implied; especially in view of the fact that the evidence upon this point leaves no room for doubt.

The judgments of the trial court and of the Court of Civil Appeals are reversed, the injunction granted by the trial court

is dissolved, and judgment is here rendered in favor of defendants that plaintiffs be denied the equitable relief sought by them.

Opinion adopted by the Supreme Court July 15, 1936.
Rehearing overruled October 14, 1936.