MAGEE HEIRS ET AL V. FRANK T. SLACK.

No. A-3921. Decided May 20, 1953.
Rehearing overruled June 24, 1953.
(258 S. W. 2d Series 797)

428

*W. H. Scott*, Criminal District Attorney, *W. K. Richardson*, Assistant Criminal District Attorney, *Knipp & Broady* and *Ernest A. Knipp,* all of Houston, for petitioners.

The Court of Civil Appeals erred in finding as a matter of law that the plat and dedication of the streets in San Jacinto River Estate No. 2 were rendered void by the act of the State Highway Department in including sections of such streets as part of the right of way for a state highway because that action constituted a refusal on the part of the State to accept the dedication of such streets because the dedication having become final under the facts, such inclusion into the right of way of a State Highway did not constitute a diversion of use or an additional burden on the dedicated easement area. Blair v. Archer County, 145 Texas 102, 192 S.W. 2d 573; Boston Chamber of Commerce v. City of Boston, 217 U.S. 189, 30 Sup. Ct. 459; Harris County v. Taylor, 58 Texas 690.

*Vinson, Elkins & Weems, Thomas Fletcher, Robert E. Morse, Jr.,* and *R. Richard Roberts,* all of Houston, for respondent.

In reply to petitioners' proposition cited City of Fort Worth v. Burnett, 131 Texas 190, 114 S.W. 2d 220; City of Corsicana v. Zorn, 97 Texas 317, 78 S.W. 924; Milam County v. Akers, 181 S.W. 2d 719, Error refused N.R.E.

MR. JUSTICE BREWSTER delivered the opinion of the Court.

As originally filed, this case was an action in trespass to try title with alternative pleas for a declaratory judgment and for condemnation of a part of the land involved for highway purposes. The plaintiffs were 23 individuals, collectively designated as the Magee Heirs, the State of Texas, and Harris County. The defendants were Frank T. Slack and 10 other individuals. In the process of trial the cause became one of condemnation; and, because of disclaimers by some defendants, agreement as to the rights of some, and default by others, only Slack remained as a defendant.

After a jury verdict favorable to Slack on special issues, the trial court awarded him judgment for $10,242.22 and the State "an easement and right of way over and across" the land in suit. The Court of Civil Appeals reversed that judgment and remanded the cause for a new trial. 252 S. W. 2d., 274.

On Oct. 5, 1939, the two owners of land in the Joseph T. Harrell Survey, Abst. 330, in Harris County, filed for record with the County Clerk of that County what they designated as a "map of San Jacinto River Estates, Section No. 2" subdividing the tract "according to the lines, lots, streets, alleys, parks and easements" shown on the map and dedicating "to the public use all the streets, parks, alleys and easements shown thereon."

Subsequent deeds to lots in this subdivision made reference to this map, the south part of which we have copied in the following sketch, in the hope that it will aid in a better understanding of the issues before us.

Slack acquired all of what appears as Block 29, consisting of 30 lots, by deeds executed in 1945, 1946, and 1947, which described the property by reference to the plat and dedication. Block 29 was a long rectangular lot running approximately east and west. Extending along the entire north side of Block 29 was a street 60 feet wide, called Eddington Drive. To the north of Eddington Drive and reading from west to east were the following blocks and streets: Block 24, Sylvan Lane, Block 25, Pineview Drive, Block 26, Oakview Drive, Block 27, a "Reserve for Park", Park Drive, Block 28 and Monmouth Drive. The "Reserve for Park" and all blocks except Block 24, by their longest dimensions, extended approximately north and south with the northern boundary of Eddington Drive as the southern boundary of each. Sylvan Lane crossed Eddington Drive and extended along the west boundary of Block 29. Monmouth Drive also crossed Eddington Drive and extended along the east boundary of Block 29. The other streets named stopped at Eddington Drive. Lying along the entire south boundary of Block 29 is Market Street Road, which is a two-lane county highway constructed on a right of way from 200 to 250 feet wide; its roadway proper is a 20-foot slab laid on an elevated embankment; its northern boundary line is the southern boundary line of the subdivision above described.

It developed that because of its low altitude and the consequent probability of overflow either by high tide or by any swelling of the San Jacinto River, this San Jacinto River Estates, Section 2, was not adapted to the purpose of its dedicators to make it a residential area. Much of it was swampy, marsh land with an altitude of from 5 to 10 feet with the result that, except in the area of Monmouth Drive, which is the eastern boundary of the subdivision, the land was held as acreage under fence and used as a cattle range. None of the streets shown on the plat except Monmouth Drive were ever marked on the ground, opened or in any manner used as streets. They, too, were fenced. In the Monmouth Drive area were some 25 or 30 dwellings, most of which were described as "little one or two room cottages or cabins" unfinished on the inside. Also there was a garage and a small grocery on Monmouth Drive. Continuously since 1937 Slack and his predecessors had about 90 acres under fence, including most of the area in dispute. His land was in the lowest part of the subdivision, its altitude being from 5 to 10 feet, and has been covered by hurricane tides to a depth of 10 feet. Therefore, it was not useful for building sites. From 1937 until two years before the trial Slack and his predecessors

grazed cattle on his land. Since that time he has used it exclusively for sand operations (which began in 1942) to produce sand for commercial sale; and in those operations he has removed the topsoil from about half of the area here involved to a depth of from 4 to 6 feet. It was shown without dispute that since the platting of the subdivision neither the State nor the County has made any effort to open or utilize Eddington Drive or any of the other streets extending to the north from Eddington Drive enclosed by Slack's fence. Nor has any party owning an interest in the subdivision made any such effort, except that one Shields, who owned the entire subdivision in the early forties, tried to get the County Commissioner to open some of the streets, but the request was refused. Moreover, no attempt has been made by anybody to interfere with Slack's use of any of the area designated as streets for grazing cattle or for sand production. In fact, according to Shields, no lots were ever sold anywhere in the area in question because it was subject to overflow to a depth of 10 feet, hence was not usable as building sites.

The right of way strip sought to be condemned by the State is 310 feet wide. On it the State proposes to construct two concrete lanes on each side of the center, each lane to be 24 feet wide, with 10-foot shoulders. In the area involved here the highway will be raised by artificial fill so that it will be higher than any reasonably anticipated hurricane tide. This project is part of the plan of the State Highway Department to build State Highway 73, U. S. 92, between Houston and Port Arthur.

In relation to the issues at bar, the proposed right of way (as outlined on the above map in heavy black lines) takes (1) that part of Monmouth Drive which lies south of Eddington Drive and immediately east of Block 29, (2) the entire width of Monmouth Drive at the north line of Eddington Drive, (3) all of Eddington Drive from the east line of Monmouth across to the west line of Sylvan Lane, (4) all of Lots 30 to 8 and from a point in Lot Seven most of Lots 7 to 1, all in Block 29, (5) a narrow slice of the block marked "Reserve for Park", the tip of Block 27 and, as it proceeds west a progressively larger portion of land off the south end of Blocks 26, 25 and 24 as well as increasingly larger sections off the south end of Oakview Drive, Pineview Drive and Sylvan Lane.

The land which the State is seeking to condemn as against Slack amounts to 18.924 acres. He admittedly owns the surface estate and 1/16 of the mineral estate in the tract, but 4.187 acres of it, which is made up of Eddington Drive and the south-

ern ends of the other streets proposed to be taken by the condemnation as above related, is subject to whatever effect must be given to the plat of San Jacinto River Estates, Section No. 2.

In its condemnation pleading the State asserted that it already had an easement in Eddington Drive and the portions of the other streets, which it was entitled to use for its new highway and that Slack was not entitled to any damages by reason of such use; that if it were mistaken in that contention, it sought alternatively a judgment condemning the same, assessing damages, etc.

Substantially in the form suggested in State v. Carpenter et al., 126 Texas, 604, 618, 89 S. W. 2d, 194, 979, the trial court submitted only four special issues and the jury found: (1) That $700 per acre "is the present cash market value" of the land owned by Slack within the proposed right of way for State Highway No. 73, considered as severed land; (2) that $5 per acre is the cash market value of such land after its taking for the proposed right of way for State Highway No. 73; (3) that present market value of the remainder of Slack's land, exclusive of that sought to be condemned in this suit and that already dedicated to public use is $750 per acre; and (4) that the value of the land described in the third special issue, supra, immediately after the taking was $750 per acre.

In his judgment the trial court found "from the uncontradicted evidence" that the 4.187 acres made up from Eddington Drive and the south portions of the streets joining it on the north had already been dedicated permanently to the public for road and street purposes, subject to which Slack had acquired title. He awarded Slack a recovery of $10,242.22, being the value of 14. 737 acres at $695 per acre, and gave the State an "easement and right of way" over the entire 18.924 acres belonging to Slack.

The main phase of the case before us hinges on two points of error, one of which presents the proposition that the effort by the State Highway Department to incorporate Eddington Drive and parts of the streets to the north as part of its proposed new highway amounted to an acceptance of their dedication in the original plat of the subdivision rather than a refusal or rejection of them, as held by the Court of Civil Appeals; the other point urges the proposition that it was error for the Court of Civil Appeals to hold that the attempted designation of the streets in question had been abandoned before the State

took action to impress them into service as a part of a new State and Federal 4-lane highway, because, petitioners say, there is no evidence of abandonment.

The issues before us have been well briefed by both sides. Many cases from this and other jurisdictions as well as other authorities have been cited and urged as determinative. It is obvious that it would be impracticable for us to attempt to show, on the one hand, which of these we regard as having no applicability to this case; or to attempt to show, on the other hand, why we think the others are decisive of the issues at bar.

■ We have concluded that the Court of Civil Appeals did not err in holding that the 1939 dedication of Eddington Drive and the parts of the other streets taken by the State by condemnation to incorporate into its new highway had been abandoned before the State took any steps to make the dedication effective.

This court held in Griffith et al. v. Allison et al., 128 Texas, 86, 96 S. W. 2d., 74, that abandonment, even of an easement acquired by purchase, occurs when the use for which property is dedicated becomes impossible, or so highly improbable as to be practically impossible, or where the object of the use for which the property is dedicated wholly fails. A number of cases from other jurisdictions were cited in support of that conclusion. We quoted it with approval in the recent case of Adams v. Rowles, 149 Texas, 52, 228 S. W. 2d., 849, although we did hold it was not decisive of that case because the only evidence of abandonment was mere "non-user".

In Griffith et al. v. Allison et al., supra, the dedicators planned a "dream" city to be contiguous to Corpus Christi and fronting on Corpus Christi Bay. As part of the project a strip of land approximately 300 feet wide and 3 miles long fringing the bay, was shown on the map as "Ocean Drive", with some sections of it marked "park". Adjoining Ocean Drive, the site for the proposed new city was elaborately marked off showing more than 1700 blocks of 64 lots each, as well as appropriate streets and avenues. Allison et al. owned some of these lots; Griffith et al. owned lots in Ocean Drive by deeds from the original dedicators, who claimed that the park, if ever dedicated, had reverted to them by abandonment of the park easement. The suit was to enjoin Griffith et al. from interfering with free use of the park and requiring them to remove fences which they had built around their lots. Allison et al. urged (as do petitioners here) that because they had bought their lots with reference

to a map which designated streets, squares, parks, etc., an irrevocable implied grant or covenant resulted which could never be destroyed by an inconsistent use by the dedicator. Griffith et al. contended that if there had ever been an effective dedication of the park, rights therein acquired by the predecessors in title of Allison et al. by deed references to the map had been lost by abandonment; that, since the purpose for which the original dedication had failed, the fee in the parkway had reverted and, therefore, had been acquired by them "through due conveyances". Giving consideration first to the dedicated strip, Ocean Drive, this court pointed out that the strip was never actually opened or devoted to the uses intended; that no portion designated as "park" had ever been used as such but at times had been partly under fence, partly covered with brush, had houses on it at different places and had been used some for fishing and other purposes; that after appropriating a strip of 60 feet for a distance of 3 miles, upon which a paved highway had been constructed, the Commissioners Court of Nueces County ordered that what was left of Ocean Drive "was abandoned for public highway purposes"; that, therefore, the over-all purpose of the dedication had become impossible of performance.

Then, "looking at the matter from the broader viewpoint, and considering the attempted dedication of the 300-foot strip as only a feature of a larger enterprise", this court said that the testimony showed that "this experiment, practically in its entirety collapsed shortly after its inception." Summarized, this testimony was that with the drouth of 1892, the plan of building a big town "blew up" and was abandoned by the dedicators; that Port Aransas Company, organized by the dedicator-owners as their sales agent, very soon became insolvent; that large portions of the lots were encumbered by liens before the dedication and title to them passed out of the dedicators by foreclosures; that comparatively few sales were made with reference to the map and they were of blocks rather than lots, thus indicating that the land was being considered as acreage and not as city property; that the Commisisoners Court has ordered numerous streets, avenues and park areas shown on the map vacated, thus throwing the land back into acreage; that only a few streets were ever actually opened and used by the public while the others were never opened but remained, except on maps and in deeds, indistinguishable from the surrounding territory; that long before plaintiffs and defendants acquired their titles lot owners had commonly fenced their lots and contiguous streets and used their land for stock raising and farming. The court held that "this testimony, as a whole, discloses such a complete abandon-

ment of this proposed enterprise in all of its essential features as amounted to a destruction of the general scheme and purpose", which creates a condition whereby the "object of the use for which this property was dedicated wholly fails."

We have already stated the material facts in the case at bar, which show conclusively that the purpose of the dedicators to create a residential area had wholly failed and had been rendered impossible of accomplishment, and had therefore been abandoned long before the State moved to secure a right of way for its new highway. To hold otherwise would be to ignore the realities of the situation; for example, as pointed out by the Court of Civil Appeals, to say that this marshy and swampy subdivision could ever be reasonably usable as a site for residences, except for the small Monmouth Drive area on the eastern fringe, we would have to go on the assumption that the San Jacinto will some day so radically change its course that it cannot overflow the area and that somehow high tides from the bay will cease to come in over it.

This conclusion renders it immaterial to decide whether the effort by the State to incorporate Eddington Drive and parts of other streets into the new highway was an acceptance or a refusal of the dedication. In either case it came too late because there was no dedication either to accept or to refuse.

■ The respondent challenges the jurisdiction of the district court to try this case. He says that generally jurisdiction in condemnation proceedings is in the county court, the only exceptions to which rule are provided by Art. 3269, Vern. Anno. Civ. Stats. These exceptions began by a statute passed in 1899, which has been twice amended by Acts 1931, 42nd. Leg., p. 413, ch. 245, sec. 1, and by Acts 1945, 49th Leg., p. 404, ch. 259, sec. 1. The effect of the amendments has been to extend and liberalize the exceptions.

Relevant portions of the statute, as amended, read: "When the State of Texas, or any county * * * is a party, as plaintiff, defendant or intervenor, to any suit in a District Court, in this State, for property or for damages to property occupied by them or it for the purpose of which they or it have the right to exercise such power of eminent domain, * * * the Court in which such suit is pending may determine the matters in dispute between the parties, including the condemnation of the property and assessment of damages therefor, upon petition of the plaintiff, crossbill of the defendant, or plea of intervention by the

intervenor asking such remedy or relief, and such petition, cross-bill of (or) plea of intervention asking such relief shall not be an admission of any adverse party's title to such property; and in such event the condemnor may assert his or its claim to such property and ask in the alternative to condemn the same if he or it fails to establish such claim * * *."

Respondent contends that the statute does not give the State the right of condemnation in this suit because of the language *"for property* or for damages to property *occupied by * * * it* for the purposes of which" it has the right to exercise the power of eminent domain. (Italics ours.) He argues that since the State was not actually occupying the strip it seeks to condemn the statute gives it no right to condemn it by alternative plea in his suit. We believe that to sustain respondent's contention would be an unwarranted limitation on the legislative intent. Before the statute was amended in 1945, it was only when the litigant having the right of eminent domain was a *defendant* that he could seek condemnation in suits like this; but under the Act of 1945 it can be invoked by the State whether it is plaintiff or defendant, or it may invoke the right even as an intervenor. Before the Act of 1931 a count for condemnation in suits like this constituted an admission of plaintiff's title, but that Act provided it should not be regarded as such an admission. Acts 1931, 42nd. Leg., p. 413, ch. 245, sec. 1. And the amendment of 1945 incorporated the same provision.

Moreover, the caption to the amending statute of 1945 (Acts 45th Leg., Reg. Sess., ch. 259, p. 404) describes the Act as "providing for procedure and practice in suits in the district courts of this State, invoking the title *or* rights of possession *or* to acquire properties, which any party having the power of eminent domain may seek to condemn * * *." That language gives the statute a breadth of application sufficient to include this suit as well as to give effect to the general policy of our jurisprudence to avoid a multiplicity of suits.

Our holding disposes also of all other points presented by petitioners except one, which asserts that the Court of Civil Appeals should have rendered judgment instead of remanding the cause for a new trial. They say that since the jury found that the value of Slack's land taken by the State under condemnation amounting to 14.737 acres (excluding 4.187 acres made up of Eddington Drive and the portions of the other streets taken) was $695 per acre, the Court of Civil Appeals should have added to the trial court's judgment in Slack's favor the sum of

$2909.96, that being the value of the 4.187 acres at $695 per acre; that the judgment thus reformed should have been affirmed.

■ Respondent insists that the Court of Civil Appeals correctly remanded the cause. He points out that the trial court instructed the jury that he, Slack, was bound by the dedication of streets in the subdivision and that the right of way as shown on the plat is entitled to lateral support of adjoining land, defining right of lateral support as the right of the public to have the right of way supported and protected in its natural condition by adjoining land; that one engineer testified that the area which must be left for safety, as lateral support for the streets was 90 feet, while another testified that 60 feet would be required for that purpose; that under the charge and the evidence, the jury was bound to know that respondent could not remove sand from a strip from 60 to 90 feet of the land which was admittedly his and which was a part of the 14.737 acres which the jury found was damaged $695 per acre; that, therefore, the jury necessarily gave a lower value to the land than they would have done had the trial court permitted recovery of damages to the entire area condemned without the encumbrance of the platted streets and the consequent lateral support instruction. The record shows that the principal value of land involved is the sand deposits, the taking of which has proved very lucrative. We have concluded that respondent's argument has merit at least to the extent that we would not be warranted in holding that the action of the Court of Civil Appeals in that regard was erroneous.

It follows that the judgment of the Court of Civil Appeals is affirmed.

Opinion delivered May 20, 1953.

Rehearing overruled June 24, 1953.