# ESTATE OF LEVI LILLIBRIDGE, DECEASED.

## APPEAL BY MARY L. HULL ET AL. FROM THE ORPHANS' COURT OF LACKAWANNA COUNTY.

Argued February 27, 1890—Decided March 10, 1890.

The testimony presented by the petitioners for an issue devisavit vel non on the ground of alleged testamentary incapacity, showing that the will was executed during the last illness of the testator twenty years before the proceedings, but failing to show testamentary incapacity at the time of execution, while the testimony presented by the respondents clearly indicated testamentary capacity covering the very time the will was made, it was not error to refuse the issue.

Before PAXSON, C. J., STERRETT, GREEN, CLARK and McCOLLUM, JJ.

No. 255 January Term 1890, Sup. Ct.; court below, number and term not given.

On July 9, 1887, Mary L. Hull and Phœbe A. VanCleef presented their petition showing that they were daughters and heirs at law of Levi Lillibridge, deceased, who died on June 6, 1869, leaving to survive him a widow and four children; that an alleged last will and testament of said deceased had been admitted to probate by the register of wills on August 23, 1882, and letters testamentary issued thereon to G. J. and John N. Lillibridge; that the decree of the register admitting said will to probate was erroneous, for the reason that at the time when the alleged will was executed the deceased was not of sound and disposing mind and memory, was incapable of making a valid will, and was also subjected to undue influence; praying for leave to appeal from said decree, for a citation, etc.

A citation having been awarded and answers filed, testimony was taken and reported, and on December 14, 1889, the petitioners presented a second petition alleging that material facts were in dispute, averred on the one side and denied on the other, and praying for an issue devisavit vel non.

On December 30, 1889, the court, GUNSTER, P. J., filed an

opinion, which, after citing and considering § 41, act of March 15, 1832, P. L. 146; Harrison's App., 100 Pa. 458; Graham's App., 61 Pa. 43; Cozzens' Will, 61 Pa. 196; DeHaven's App., 75 Pa. 337; Schwilke's App., 100 Pa. 629; Knauss's App., 114 Pa. 10; Herster v. Herster, 116 Pa. 612; s. c. 122 Pa. 239; Daniel v. Daniel, 39 Pa. 191; Tawney v. Long, 76 Pa. 106; Leech v. Leech, 21 Pa. 67, proceeded:

What does the testimony disclose as to the fact alleged to be in dispute? Let us examine first that adduced by the appellants and then that adduced by the defendants.

A. S. Newton testifies that he knew the deceased in his lifetime, saw him during his last illness, sat up with him some two or three nights, was not much with him in the daytime. Deceased had a bruise on the right side of his head, and suffered much pain in the head and from a severe cold; slept a good deal while witness was with him, and seemed out of his head, talking about different things; cannot remember what he said, but he worried about his property and cattle; thinks he was incapable of transacting business. On cross-examination, he testifies that this opinion is formed from the deceased's sickness. Had little conversation with him, only to ask him how he felt.

Dr. H. Hollister testifies that he knew the deceased first about forty-five years ago, and knew him until he died. During that time, he was the family physician, and saw deceased nearly every day; was called to see him in his last illness, May 19, 1869, and with the exception of June 4, attended him daily until June 6, the day of his death; found deceased suffering from typhoid pneumonia, a severe case of inflammation of the lungs; he was in bed at this time. His mental condition was bad. He showed this by his talking. He recognized witness when he went in, but after he had been there an hour, lost sight of his presence. Complained of his head and lungs. Had a hurt on the head, a slight wound. Said he was very sick, and wanted relief. Was given medicine; was conscious at brief intervals; talked but little and that to himself; was delirious, out of his head. Afterwards, this was more marked until he lost consciousness before he died. His mind and memory seemed to have failed him entirely almost from May 19th. His mind seemed to be wandering, disturbed, and

he was unfit to transact any business of any kind or character. Once in awhile he would recognize witness when he went in, but oftener would not; lay in a stupid condition from the time he was taken sick until he died, talking but little to any one. Witness does not remember any of the conversation.

The witness further testifies that typhoid pneumonia, as a rule, renders the mind very weak from the start; that it so affected Mr. Lillibridge ; that he could not put a dozen words together correctly so as to give an expression to an idea; that the disease affects the mind through the nerves and blood vessels ; the blood does not receive sufficient oxygen to properly supply the brain with its ordinary stimulus; that deceased was prostrate with fever from the very first. His pulse was 130 to 140, and his tongue black and dry. Previous to the illness the doctor had observed him to act strange. In his opinion, from what he saw of Mr. Lillibridge, between May 19, 1869, and the time of his death June 6, 1869, he was just as " incompetent and incapacitated as a cat" to transact any business.

On cross-examination, the witness answers that in his conversations with the deceased he simply asked him about his complaint and condition ; heard no person engage him in any business, or ask any questions about business while he was there; that any man who is incompetent to transact one kind of business is incompetent to transact others; that a man severely ill with fever and partly unconscious at times, delirious at others, might become aroused and talk and act rationally on matters of business, when his attention was called to such as deeply interested him : " Like a stroke of lightning he might get a lurid gleam for a little while, and that would end it."

On re-direct examination, the witness further testifies that his reason for saying that Mr. Lillibridge was unfit to transact business was, that when he asked him how he felt, he sometimes would begin a sentence and never finish it; he would talk about coal lands, mortgages and things irrelevant to the subject he was inquiring about. He seemed to lose the sense of the subject, and could not pursue the subject continuously, right along.

Stephen P. Hull testified that he was with Mr. Lillibridge part of the time during his illness ; went there a few days after he was taken sick, and remained until three or four days or a

Opinion of Court below.

week prior to his death; assisted in taking care of him. First went there about the 21st or 22d of May. Deceased was very sick lying in bed; big spot on the side of the head; he looked like a man in his last sickness, as though he was stricken with death. Had high fever and great difficulty in breathing. Did not talk much. When witness first went into the room, deceased said he was glad to see him; said he was glad to see somebody around the house that was quiet; said the folks around the house had been going around the house with their eyes stuck out of their heads, as though they were wild; glad to see some one who was not excited. Witness was with deceased mostly during the day time. He had typhoid pneumonia, and was under the control of the disease physically and mentally. Slept a great deal during the day, and when not asleep seemed to be in distress. Did not talk except to answer a question or ask one, and very little of that. A good deal of the time his mind was not clear. Asked one day how many children witness had. Witness is husband of one of the daughters of deceased. One day he spoke about Deacon Young, who had died in the same room in which he, Lillibridge, was, some four or five years before that. Does not recall anything more, particularly. The two cases given are a fair illustration of what deceased said when talking to himself. There was no sense to his talk at such times. In the opinion of the witness, the deceased was not capable of transacting any business requiring the exercise of his mental faculties, while he was there.

On cross-examination, the witness testifies that he recollects no particular conversation with the deceased. On the day the will was executed he was off fishing, but learned of it on his return about three o'clock. Had been with deceased the night before, who had a very bad night. He seemed to rest easier in the morning before I left, but could not talk in any connected way.

Phœbe A. VanCleef testified that she was the daughter of Levi Lillibridge deceased, and first knew of the contents of the will the day of her mother's death. On cross-examination she testified that her father told her the night she got home that he had made a will. She got home Wednesday or Thursday before the Sunday on which her father died. On re-direct

Opinion of Court below.

examination, she testified that she did not think her father appeared to understand what he was talking about, and then on re-cross-examination she said I don't think he knew the kind of will he had made. . . . . . He had made a will, and he knew he had made a will. She thinks her father knew her. He introduced the subject about the will himself.

The appellants also adduced evidence showing that the land of which the deceased died "possessed" consisted of from forty to forty-seven acres, the surface of which is underlaid by three or more veins of coal; that the value of coal in place in 1869, was from ten to fifteen cents per ton, and that deceased knew his land was valuable coal land. The evidence shows that the land was worth about $500 per acre in 1869, and that it is worth about $1,500 per acre now.

While the foregoing is not all of the oral testimony adduced by the appellants, it is believed to be the substance of so much thereof as has any bearing on the question now before us.

By the terms of the will itself, the deceased after directing the payment of his debts and funeral expenses, bequeaths all his property, real, personal and mixed, to his wife for her support and comfort during her life. He then gives and bequeaths all of said property which shall remain after the decease of his wife, to his sons G. J. Lillibridge and John N. Lillibridge, share and share alike, except what he gives and bequeaths to his daughters Phœbe A. VanCleef and Mary L. Hull, to each of whom he gives and bequeaths the sum of $2,000 to be paid out of said property after the decease of his wife, by his executors, as follows, viz.: $500 each, within six months, $500 within six months thereafter, and the balance of $1,000 each, within the next two years thereafter. And lastly, he appoints G. J. Lillibridge and John N. Lillibridge executors of said will. The instrument is dated the twenty-third day of May, 1869, and the name of Levi Lillibridge is signed thereto in a firm hand. It is duly witnessed by S. Callender and Z. B. Knapp, the subscribing witnesses. . . . . .

—The court then considered the testimony of thirteen witnesses called by the respondents in support of the will, abstracting that of Stephen Callender, the scrivener, as follows:

Stephen Callender testifies that he was 78 years old; had been a justice of the peace for forty years, and was such in

Opinion of Court below.

1869; was acquainted with Levi Lillibridge about forty years before his death, and lived about half a mile from him; wrote his will; cannot say what day of the week it was when he wrote his will; one of the sons came for witness: not certain which one.

"I went down and went into his room; sat down on the side of the bed. His head was toward Scranton, and my elbow at his side. I was facing toward Carbondale. I asked how he wanted the will written; what disposal he wanted to make of his property; how he wanted to dispose of it. He first referred to the funeral expenses. I think he spoke of it, I am not certain about that, as it was a form. That was the first that was written.

"As near as I can recollect he spoke of his wife, and said she was to have her support out of it as long as she lived. I don't recollect what came next in order, but I think it was the balance was to be divided between his sons by paying his daughters, I think it was $2,000 each in a certain manner. I think it was $500 in six months, $500 in six months after, and the other $1,000 in a year or two, and I rather think with interest. I did not say anything to him about the shares of the daughters. I did not undertake to meddle or dictate; that was out of my line. I don't remember anything being said by him about any advancement to his daughters. I wrote the will as near as I could as Mr. Lillibridge dictated it. I think he nominated his two sons as executors to carry out that will.

"Q. After you had written the will, did you return to · Mr. Lillibridge's sick room and read the will to him? A. I think I did.

"Q. Was anybody present besides you two, when you read the will over to him? A. I don't remember that there was just at this point.

"Q. When you read the will to him, what, if anything, did he say, as to its correctness? A. I don't know as he said anything more than that he signed it. I don't recollect his speaking more than that he assented to it by signing it. It was signed at that time. There was no change made to it, I think, after I presented it."

The witness further testifies that Z. B. Knapp was present and witnessed the signature; that some one remarked about

the signature at the time, " Mr. Lillibridge carries a steady hand for a sick man;" that Jerome or his mother or both were in the room at the time ; that, in the interview or during the time when called to write the will, there was nothing incoherent or irrational in the conversation between himself and Mr. Lillibridge concerning the will; thought he lacked a little in judgment. Witness was well acquainted with property of deceased ; considerable real estate as well as personal, and thought as he named $2,000 for each of his daughters he was very liberal taking the personal property and surface into consideration ; but he neglected taking the mineral into consideration, or he would have done better by the girls no doubt. No one interfered while Mr. Lillibridge was dictating the will. The witness thought Mr. Lillibridge understood all he said, but thought at the time he was lost in memory or judgment. He gave of his own accord the division of his property, without being asked any question, except the general question how he would dispose of it. . . . . .

What conclusion is to be reached from an examination of the whole testimony ? Not what conclusion we would reach, if we were sitting as jurors on the trial of an issue; but, under the plain rules prescribed for our guidance, and which have already been quoted, what conclusion should we reach as to the disposition of a verdict, in case, under the evidence before us, one were to be rendered against the proponents of the will ? Would not such a verdict be contrary to the manifest weight of the evidence, and would we not feel constrained to set it aside ? On this question, there does not seem to be room for doubt or hesitation.

Without entering into any further analysis of the testimony, we feel safe in saying that the testimony adduced by the appellants is far from being strong, is inherently weak, and that it is weakest where it should be strongest. Except as it does so inferentially, it does not show testamentary incapacity in Mr. Lillibridge at the very time the will was executed, and the testimony of Dr. Hollister, that a man so seriously ill might get a lurid gleam for a little while ; the testimony of Mr. Stephen P. Hull, that a good deal of the time the mind of Mr. Lillibridge was not clear, and the testimony of Mrs. VanCleef, detailing her interview with her father, at least a week after the

Arguments.

execution of the will, in which he spoke of having made a will, and what disposition he had made of his property, leaves. to say the least, abundant room for lucid intervals. And on this point, and covering the very time when the will was drawn and executed, the testimony adduced by the respondents is full, clear and overwhelmingly in their favor. It is virtually uncontradicted. It is true, the testimony of Mr. Callender, the scrivener and one of the subscribing witnesses, is somewhat weakened by his expressions of doubt as to the memory and judgment of Mr. Lillibridge, but an examination of his testimony clearly shows, that what doubts he had were caused, not by any weakness or failing observed by him, but by the disposition made by Mr. Lillibridge of his property. In other words, Mr. Lillibridge did not divide up and distribute his property as Mr. Callender would have done. After a careful review of all the testimony, we feel that we would be constrained to set aside a verdict rendered thereon against the proponents of the will, as contrary to the manifest weight of the evidence; and I therefore refuse the issue prayed for.

—Thereupon the petitioners took this appeal, assigning the refusal of the court to grant the issue devisavit vel non as error.

*Mr. Everett Warren* (with him *Mr. E. N. Willard* and *Mr. E. B. Sturgess*), for the appellants.

Counsel cited: Irish v. Smith, 8 S. & R. 575; distinguishing Graham's App., 61 Pa. 43; Cozzens' App., 61 Pa. 196; De Haven's App., 75 Pa. 337; Harrison's App., 100 Pa. 458; Schwilke's App., 100 Pa. 628; Knauss's App., 114 Pa. 10; Herster v. Herster, 116 Pa. 612; s. c. 122 Pa. 239.

*Mr. W. H. Jessup* (with him *Mr. Hand*), for the appellees.

As to when an issue should be directed, counsel cited: Knauss's App., 114 Pa. 10; Wainwright's App., 89 Pa. 220; Combs' App., 105 Pa. 156; Wilson v. Mitchell, 101 Pa. 505; Herster v. Herster, 116 Pa. 612; s. c. 122 Pa. 239. As to what constitutes testamentary capacity: Leech v. Leech, 1 Phila. 244; s. c. 21 Pa. 67; Wilson v. Mitchell, 101 Pa. 502; Shaver v. McCarthy, 110 Pa. 339; Reichenbach v. Ruddach, 127 Pa. 590; McMasters v. Blair, 29 Pa. 302.

Statement of Facts.

PER CURIAM:

The evidence ought to be very strong, upon the trial of an issue devisavit vel non,—much stronger than it is in this case, —to permit the will of a testator to be overthrown twenty years after his death.  It is difficult to measure the amount of testimony that may be lost by death during such a period; it is almost equally difficult to ascertain how much, and to what extent, the testimony of well-meaning surviving witnesses may be affected by loss of memory.  It may not be impossible to test a testator's testamentary capacity by what witnesses remember about him twenty years ago, but such a lapse of time certainly renders it more difficult, and therefore more unsafe. We do not think a trial judge would be justified in sustaining a verdict against this will upon this testimony, and if a verdict in favor of the contestants ought not to be sustained, the issue should not be granted.

> Decree affirmed, and the appeal dismissed, at the costs of the appellants.