**CITY OF SAN ANTONIO, Appellant,**

**v.**

**J. A. RUBLE, Appellee,**

**Reese L. Harrison, Jr., et al., Appellees.**

**Nos. 14796, 14797.**

Court of Civil Appeals of Texas.

San Antonio.

July 2, 1969.

Rehearing Denied July 23, 1969.

Craig L. Austin, Matthews, Nowlin, Macfarlane & Barrett, Ralph Brown, San Antonio, for appellant.

Baskin, Casseb, Gilliland, Rodgers & Robertson, Richard G. Strong, W. Pat Camp, San Antonio, for appellees.

BARROW, Chief Justice.

These two appeals by appellant, City of San Antonio, as owner of an electric and gas system which it operates through the City Public Service Board, from summary judgments granted appellees, J. A. Ruble and Reese L. Harrison, Jr., et al., involve common questions of law and fact which were consolidated for trial. Although two transcripts were filed in this Court, single briefs were filed by appellant and appellees to cover both appeals.

Appellant filed condemnation suits in the County Court of Bexar County to take the fee title to lands owned by appellees for public use for impounding waters behind its proposed Calaveras Dam. These suits were thereafter filed in the District Court by appellees to resolve, by declaratory judgments, their quantitative and qualitative ownership of said condemned lands and specifically to resolve the effect of certain easements which had been granted by appellees' predecessors in title. Motions for summary judgment were filed by appellant and appellees after a full development of the facts by affidavits and depositions. Summary

judgments were rendered declaring that at the time of the condemnation the property of appellees was free and clear of said easements, and that the earthen dams on appellees' property were owned by said respective appellees.

The facts are not disputed. In the early 1950's Alamo Soil Conservation District, hereinafter referred to as "Alamo District," entered upon a program, with federal assistance, to construct a series of small retardation dams for the purposes of soil conservation and flood control. This program which involved ten sites was termed the "Calaveras Creek Pilot Watershed Project." In 1954, Frank Civiletto, Ruble's predecessor in title, executed to Alamo District an instrument which is identified in the record and hereafter as Exhibit "B". In accordance with the rights granted therein an earthen retardation dam was subsequently constructed on Hondo Creek by the Alamo District with federal funds and identified as Site 4. In 1956, Reese L. Harrison, Sr., predecessor in title to Reese L. Harrison, Jr., et al., executed to Alamo District a similar instrument, also identified as Exhibit "B", and Alamo District subsequently constructed a retardation dam on Minita Creek, known as Site 1. About half of Site 1 is on the Harrison land and half on his neighbor's land.

No cash consideration was paid either Civiletto or Harrison for execution of Exhibit "B". Rather, the undisputed evidence shows that each grantor executed same after being assured that the construction of the retardation dam would improve his land by reducing soil erosion and by producing better pasturage. In addition, each party was to have full ownership of the water behind each dam, which could be used for irrigation or recreation purposes.

Exhibit "B" which was drafted by Alamo District provides, in part, as follows: 1. Grantors (Civiletto and Harrison) grant and convey unto Grantees (Alamo District), their successors and assigns, "the right, privilege and authority to enter upon, construct, operate and maintain an Earthen fill dam and other structures for the retardation of the flow of floodwaters and reduction of sedimentation, over and upon the following described land: * * * 3. All property of any kind whatsoever placed by or utilized by the Grantees upon, over, under or in said structures, in, upon, over, or under the property of the Grantors, whether such property be affixed to the realty or not, shall be and remain the property of the Grantees, and the Grantees shall have the right to move or remove such property at any time. * * * 8. This easement shall not pass nor shall the same be construed to pass to the Grantees any fee simple interest or title to the above-described land." The granting clause provides: "TO HAVE AND TO HOLD the aforesaid easement or right-of-way unto the Grantees, their successors and assigns, *for so long as the Grantees, their successors and assigns, shall continue to use said easement or right-of-way for said purposes.* In the event the maintenance and operation of such structures shall be abandoned by the Grantees, their successors and assigns, for a period of two years, the rights and privileges herein granted shall cease and determine. All property, fixtures, and improvements not removed by the Grantees within six months after expiration of this easement, shall be and remain the property of the Grantors." (Emphasis added.)

Earthen dams were then constructed on each of the two sites in question. Each was so designed and constructed that it would retain water to a certain elevation or contour, whereupon water would spill through a draw-down tube, about 22 inches in diameter, into the creek bed below the dam. Water would not rise above the mouth of the tube except at short intervals when the run-off water accumulating behind the dam was of such volume that it could not immediately be discharged. A secondary spillway was constructed several feet in elevation above the draw-down tube, but below the crest of the dam, whereby such accumulated flood waters could flow into the creek bed until they receded to the level of the draw-down tube. The lake formed below the

elevation of the draw-down tube was called the sedimentation pool and it inundated approximately 45 acres on each site, depending upon the amount of rainfall as compared to the evaporation rate. The elevation of the draw-down tube on the Harrison dam was 468.6 feet above sea level, the secondary spillway elevation was 484 feet and the crest of the dam was 489 feet. The draw-down tube on the Ruble dam was 477.5 feet, the spillway was 492 feet, and the crest of the dam was 496 feet above sea level. During more than ten years existence of these two retardation dams, the water level never reached the secondary spillway of either site, although there was excessive rainfall during this time, particularly at the time of Hurricane Beulah. It was contemplated that a rainfall of sufficient magnitude to cause the water level to reach the crest of either dam would only occur every hundred years. No structures were contemplated or built by Alamo District other than a fence around the dam proper.

Although the sites were acquired solely by Alamo District, the San Antonio River Authority, hereinafter referred to as SARA, was interested in this project, particularly in the maintenance of these retardation dams. In 1963 SARA secured authority to levy a tax for operation and maintenance of these sites as required of the Grantees under the terms of Exhibit "B". In order to justify such tax expenditures, Alamo District conveyed to SARA an undivided one-half interest in the rights it acquired in all sites under the agreements entered into by Alamo District with the various landowners. In 1966 it became apparent to appellant, hereinafter referred to as CPSB, that the Harrison and Ruble sites would be inundated, and therefore would have to be acquired as a part of its contemplated Calaveras Lake Project. Negotiations were had between agents of Alamo District, SARA, and CPSB, leading to the "friendly" condemnation by CPSB of Grantees' rights under Exhibit "B". On July 11, 1967, Alamo District transferred its remaining one-half interest to SARA for the stated purpose of reducing the problems of acquisition of said sites by CPSB, with the understanding that SARA would use one-half of the proceeds of $88,753.18 to be paid SARA by CPSB as construction and right-of-way funds for the Salado Creek Project of Alamo District, which was planned in another part of Bexar County. On July 11, 1967, condemnation proceedings were filed by appellant against SARA, and on July 13, 1967, an award of $88,753.18 [1] was made by the Special Commissioners, which was reduced to judgment by agreement on July 25, 1967. Thereby appellant was vested with and granted judgment for all right, title and interest owned by the said San Antonio River Authority to said described tracts.

On July 11, 1967, appellant sought to condemn from the Harrison appellees the fee title to 390.13 acres plus an easement across sixty acres. The Special Commissioners' award was filed on July 13, 1967, and the money deposited by appellant on August 10, 1967. Appellant filed condemnation proceedings against Ruble on October 16, 1967, for the fee simple title to 234.61 acres of land. The award of the Special Commissioners was filed on November 3, 1967, and the money deposited on November 8, 1967. These suits for declaratory judgment were filed in early 1968.

The stated purpose of the Calaveras Lake Project of CPSB is for the storage of cooling water necessary for the operation of its electrical generating equipment. For this purpose a large dam was proposed on Calaveras Creek below the retardation dams. This proposed lake will inundate land behind the dam from contour 430 to 485 feet. The crest of the dam will be at 498 feet elevation, and by use of a spillway operated by steel gates the dam will serve a secondary purpose of flood control for downstream landowners. To maintain a constant level at the contour of 485 feet,

---

1. Such sum was prorated as follows: $49,357.40 for Site 1, and $39,395.78 for Site 4.

water from the San Antonio River, including treated sewage effluent, will be pumped into the Calaveras Lake. Appellant seeks fee simple title to all lands within the proposed body of the lake plus an additional 100 feet beyond the elevation of 492 feet. All of such condemned lands will be fenced and adjoining landowners, such as appellees, will be denied all access to, as well as use of, the water formed by said dam.

Appellees urged and the trial court found that the Grantees and their assigns had abandoned the use and purpose for which the rights were granted in Exhibit "B". It was further found that the earthen dams were not removed within six months after abandonment by said Grantees and therefore became the property of appellees under the terms of said agreement. Appellant asserts six points of error. By its first two points it urges that there was no abandonment because of a lack of intention to abandon. By its third point it asserts that even if there was an intent to abandon, there was no act carrying out such intention. By its fourth point it urges that it acquired the dam structures in the condemnation suit against SARA. Under its fifth and sixth points appellant urges that it is entitled to have its own motions for summary judgment granted and a declaration that it acquired the right from SARA, under Exhibit "B", to inundate the lands of appellees to the contour level of the crest of each retardation dam.

■ Clearly, an easement may be abandoned in this State. In Griffith v. Allison, 128 Tex. 86, 96 S.W.2d 74 (1936), the Court said: "It appears to be well-settled that an abandonment, even of an easement acquired by purchase, occurs when the use for which property is dedicated becomes impossible, or so highly improbable as to be practically impossible, or where the object of the use for which the property is dedicated wholly fails." See also: Magee Heirs v. Slack, 152 Tex. 427, 258 S.W.2d 797 (1953); Adams v. Rowles, 149 Tex. 52, 228 S.W.2d 849

(1950); Kearney & Son v. Fancher, 401 S.W.2d 897 (Tex.Civ.App.—Fort Worth 1966, writ ref'd n. r. e.). In Dallas County v. Miller, 140 Tex. 242, 166 S.W.2d 922 (1942) the Court said: "The material question is the intention to abandon, and that intention must be established by clear and satisfactory evidence. Mere nonuser of an easement will not extinguish it." There must be a wedding of a subjective intent to abandon with sufficient manifestation by acts of such intent. Smith v. Shuler, 258 S.W.2d 158 (Tex.Civ.App.—Eastland 1953, no writ); Thompson on Real Property, 1961 ed., § 443; 25 Am.Jur.2d, Easements & Licenses, § 103; Powell on Real Property, § 423.

An application of these rules to the undisputed record before us demonstrates conclusively that an abandonment or extinguishment of the rights granted under Exhibit "B" has occurred in that the clear purpose of said instrument has now been nullified. These easement rights were granted without cash consideration because of the conservation benefits that would accrue to Grantors' lands as well as the valuable water rights they would own. On the other hand, the Calaveras Lake Project will inundate the earthen dams as well as all lands below the elevation of 485 feet, thereby terminating the conservation program outlined in Exhibit "B". Furthermore, in lieu of the fresh-water lake to which Grantors retained fee simple title, with complete access and control, appellees will be denied all access to within 100 feet of all lands below 492 feet elevation, and also be denied any use of the water which will contain treated sewage. Although Calaveras Dam does serve a secondary purpose of flood control, such flood control is entirely for the benefit of downstream landowners and appellees will derive no such benefit. It cannot be said that in executing Exhibit "B" the Grantors intended to grant the unrestricted right to inundate all their lands below the crest of each retardation dam without receipt of any consideration therefor.

We, therefore, hold that the conveyance by Alamo District and SARA to CPSB for the purpose of constructing a cooling reservoir for its electrical power generating equipment was with the clear intention of terminating and extinguishing the purposes and uses of the easement granted by appellees' predecessors. Exhibit "B" granted easement rights "for as long as the Grantees, their successors and assigns, shall continue to use said easement or right-of-way for said purposes." The CPSB's use will nullify the purpose of the original grants. The lands of appellees which were condemned by appellant are not impressed with the easement rights created by Exhibit "B".

Another question is presented as to ownership of the earthen dams. Under the express terms of Exhibit "B", these dams were to remain the property of Grantees and they were expressly given the authority to remove same. Cf. Evangelical St. John's Church v. Otto Independent School Dist., 203 S.W.2d 299 (Tex.Civ. App.—Waco 1947, no writ). Such right was limited by the provision that if not removed within six months after expiration of said easement, they would become the property of Grantors. We, therefore, must determine the time of expiration of the rights granted under Exhibit "B". Under the undisputed record, neither site was disturbed in any manner until after appellees lands were taken by appellant depositing the amount of the condemnation award. The intention to abandon the purposes and uses for which the easement rights had been granted was fully declared by SARA's assignment to appellant of all its rights in same on July 13, 1967, and by the institution of the condemnation suits against appellees. However, appellees' title to said lands was taken within six months thereafter by depositing the amounts of the Special Commissioners' awards. Therefore, title to said dams had not reverted to appellees under the terms of Exhibit "B".

Appellees urge that appellant did not acquire SARA's interest in these dams in the condemnation proceeding and therefore fee title to same eventually passed to them. The judgment of the County Court in said proceeding against SARA provides in part: "3. That by virtue of said decision of said Special Commissioners, the CITY OF SAN ANTONIO, as a part of the electric and gas system, is hereby vested with and does hereby have judgment against Defendant, SAN ANTONIO RIVER AUTHORITY, for all right, title and interest owned by the said SAN ANTONIO RIVER AUTHORITY in and to the realty as described in said Award made herein on the 13th day of July, 1967; * * *." Such adjudication is broad enough to include SARA's right as assignee of Grantees to remove said earthen dams.

The judgment of the trial court in each case is reformed to delete the provision that the earthen dam was "solely and exclusively the property of the plaintiffs." In all other respects each judgment is affirmed.

CADENA, Justice.

I am unable to find any support for a holding to the effect that, prior to the time appellant acquired the right to possess appellees' lands which were the subject of the condemnation suit, the easement in such lands had been terminated.

Plainly, the ultimate concern of the parties relates to the valuation of the lands of appellees which appellant is acquiring by eminent domain. Appellees have a right to receive the reasonable cash market value of their lands at the time of the taking. The date of taking, for the purpose of valuation, in this case was the date on which appellant deposited the awards of the commissioners and appropriated the lands. Vernon's Ann.Tex.Rev.Civ.Stat. Ann., Article 3268; 22 Tex.Jur.2d, Eminent Domain, § 181, pp. 285–87. In order to determine the amount of compensation to which appellees are entitled, then, we

must determine the extent of appellees' interest as of the dates on which appellant deposited the awards and "took" the lands. The question which the judgment appealed from purports to settle is simply this: On the date of the taking, was appellant taking unencumbered fees, or was it taking fees subject to the easements described in the majority opinion?

Clearly, in determining the extent of appellees' interests as of the date of the taking, we must look to the situation as it existed at that time, and cannot consider facts occurring thereafter. Therefore, the conclusion that "an abandment or extinguishment" of the easements "has occurred" because "the clear purpose" of the easements "has now been nullified" is irrelevant. The pertinent question is whether, on the date of taking, an extinguishment of the easements *had* occurred because the clear purpose of such easements *had then* been nullified, as opposed to whether or not such clear purpose "has now" been nullified.

Although the majority opinion states that the easements have been "abandoned or extinguished," it is apparent that the conclusion that the easements terminated is bottomed on the doctrine of abandonment. The only reason given for the extinguishment of the easements is that their purpose "has now been nullified," and in view of reliance on the language in Griffith v. Allison, 128 Tex. 86, 96 S.W.2d 74, 77 (1936), to the effect that abandonment of an easement occurs "when the use for which property is dedicated becomes impossible, or so highly improbable as to be practically impossible, or where the object of the use for which the property is dedicated wholly fails," it is clear that the majority holding is based on the theory of an abandonment resulting from frustration of purpose.

Although the notion that an easement may be terminated by abandonment has

been challenged,[1] the authorities referred to by the Chief Justice conclusively establish that the abandonment doctrine has been embraced in Texas.

The evidence conclusively establishes that appellant intended to abandon the purpose for which the easements were created. However, the evidence as clearly establishes only an intention to abandon in the future, after appellant had acquired appellees' fee simple interests. The acts contemplated by appellant, which would result in frustration of the purpose for which the easements were given, could not be accomplished until after appellant acquired the entire interest in the lands.

As is pointed out in the majority opinion, an intention to abandon will not, standing alone, result in the termination of an easement. While expressions of intent help greatly in the interpretation of conduct which might otherwise be ambiguous, the intention must find reflection in acts or circumstances, and these facts and circumstances are usually found in evidence of cessation of use or in evidence of acts inconsistent with an intention to make further use of the easement.

We have here no evidence that, on the date of the taking, appellant had ceased to exercise the rights vested in it as assignee of the easements. Nor is there any evidence that, prior to, or on, the date of taking, appellant had engaged in any acts, on the subject premises or in connection with its manner of use, inconsistent with its desire to further use the easement. The reference in the majority opinion to the facts supporting its conclusion that the purpose of the easements has "now" been nullified, is merely a recital of future acts contemplated by appellant. This recital is couched in language of futurity. The Calaveras Dam Project "will" bring about certain consequences. Appellees "will" be denied access to lands near the impounded water. They "will" be denied use of the

---

1. Simonton, Abandonment of Interests in Land, 25 Ill.L.Rev. 261–271 (1930). See also Note, 36 Calif.L.Rev. 430 (1948).

impounded water, which "will" contain treated sewage. Even if the tense be changed, there is nothing in the record to support the conclusion that the conduct which produced these consequences had taken place prior to the date of the taking.

We, therefore, have a situation where an easement had been granted for a certain purpose and, at the time of the taking, there is nothing to indicate that these specific purposes were not being fully carried out. There had been no cessation of use. There had been no conduct inconsistent, as of that time, with the continued existence of the easements. Consequently, there is no basis for the conclusion that the easement had been extinguished by abandonment unless we are prepared to hold that an intention to abandon an easement in the future is, ipso facto, operative to terminate the easement presently.

I agree that there may be sufficient basis in the record for holding that, as of "now," the easements have been extinguished. But the termination of the easements has not resulted from application of the doctrine of abandonment. The extinguishment of the easement resulted from the fact that there has been a union of the title to the easement and to the servient tenement in the same person. That is, the easement has been terminated because of the application of the doctrine of merger, and such termination, while it occurred before appellant engaged in the activities relied on as nullifying the purpose of the easements, did not occur prior to the date of taking.

There is, perhaps, in the majority opinion, language indicating that an easement may be extinguished because of misuse or excessive use. While some commentators have indicated that misuse or excessive use may bring about the termination of an easement, it appears that the decisions furnish no support for such conclusion. 3 Powell, Real Property, § 423, p. 526.39 (1967). Even if excessive use would have the effect of terminating an easement, the excessive use here took place after the date of taking of appellees' interest. Further, if there is

an abuse of the rights conferred by the easement, the remedy of the owner of the servient tenement lies in resort to self-help, an action for damages, or an appeal to equity for an injunction. His remedy is not forfeiture of the easement. Hoak v. Ferguson 255 S.W.2d 258 (Tex.Civ.App.— Fort Worth 1963, writ ref'd n. r. e.); Anno: 16 A.L.R.2d 609, 610 (1951).