CITY OF SAN ANTONIO, Petitioner,

v.

J. A. RUBLE, Respondent.

CITY OF SAN ANTONIO, Petitioner,

v.

Reese L. HARRISON et al., Respondents.

No. B–1708.

Supreme Court of Texas.

Feb. 4, 1970.

Rehearing Denied April 29, 1970.

Matthews, Nowlin, Macfarlane & Barrett, Craig L. Austin, San Antonio, for petitioner.

Baskin, Casseb, Gilliland, Rodgers & Robertson, Richard G. Strong, W. Pat Camp, San Antonio, for respondents.

POPE, Justice.

The question presented by this case is whether the City of San Antonio acquired two easements in its condemnation proceedings against the San Antonio River Authority or whether the easements had been abandoned. The courts below have held that the City did not acquire the easements. Tex.Civ.App., 443 S.W.2d 894. We reverse that part of the judgment and render judgment for the City. We affirm that part of the judgment of the court of civil appeals that the City owned the dams themselves.

The opinion of the court of civil appeals fully states the facts, and we shall state them only briefly. In 1966, the City was planning to erect the Calavaras Dam for the purpose of impounding waters on approximately 3,500 acres of land which it needed for a proposed electrical generating plant. It therefore became necessary for the City to condemn the lands behind the proposed dam. At that time, the Harrisons owned the fee to 390.13 acres of land, Ruble owned the fee to 234.61 acres of land and each of those tracts was burdened with an easement which permitted a public agency to flood portions of the tracts as a part of a floodwater and sedimentation control program.

In 1967 the City instituted three condemnation proceedings. It filed one proceeding against the San Antonio River Authority to condemn the two easements.

The San Antonio River Authority had acquired the easements from the original grantee. The date on which the City took the easements was July 13, 1967. The City next took the fee to the Harrisons' land on August 10, 1967, and they appealed from the award of the commissioners. The City then took the fee to Ruble's lands on November 8, 1967, and he also appealed from the award. The condemnation actions against the Harrisons and Ruble are still pending on appeal to the county court, awaiting the outcome of this action. The Harrisons and Ruble, after they appealed from their awards in the condemnation proceedings, filed suits in the district court for the purpose of obtaining declaratory judgments that the easements which previously burdened their lands had terminated. The significance of the cases is that the amount of damages to which the Harrisons and Ruble will be entitled in their condemnation appeals will be affected by a judgment that their lands were or were not burdened with the easements on the date their lands were taken. The trial court consolidated the two suits for declaratory judgment, denied the City's motion for summary judgment, and sustained the motion for summary judgment by the Harrisons and Ruble. The judgments below have sustained the landowners' contentions that their fee title was not burdened with the two easements when their land was taken.

The fee owners assert three reasons why we must affirm the judgments of the courts below in holding the easements had terminated: (1) The San Antonio River Authority by its transfer of the easements to the City following the award manifested an intent to abandon, (2) the City in taking the easements frustrated the intended purpose of the easements, and (3) the San Antonio River Authority and the City, by their acts, coupled with an intent to abandon, abandoned the easements. We find no merit in any of the contentions.

What, if anything, the City acquired in its proceedings to condemn the

two easements must be determined as of the date the City took the easements. That date was July 13, 1967. In none of the transfers of the easements from one owner to another do we find any expression of any intent other than that of passing title. In 1954, Ruble's predecessor in title granted an easement to the Alamo Soil· Conservation District. The easement granted the right to construct an earthen dam on the Ruble tract for the purpose of impounding water up to the 496 foot level to retard the flow of floodwaters and to control sedimentation. In 1956, the Harrisons' predecessors in title granted a similar ͏easement over their land to the Alamo Soil Conservation District up to the 490 foot level. The portions of the easement which are here relevant are:

"* * * the Grantors do hereby grant and convey unto the Grantee, their successors, and assigns, the right, privilege and authority to enter upon, construct, operate and maintain an earthen fill dam and other structures for the retardation of the flow of floodwaters and reduction of sedimentation, over and upon * * (property description).

"TO HAVE AND TO HOLD the aforesaid easement or right-of-way unto the Grantees, their successors and assigns, *for so long as the Grantees, their successors and assigns, shall continue to use said easement or right-of-way for said purposes. In the event the maintenance and operation of such structures shall be abandoned by the Grantees, their successors and assigns, for a period of two years, the rights and privileges herein granted shall cease and determine.* All property, fixtures, and improvements not removed by the Grantees *within six months* after expiration of this easement shall be and remain the property of the Grantors." (Emphasis added.)

The Alamo Soil Conservation District in 1963 conveyed a one-half interest in the easements to the San Antonio River Authority and on July 11, 1967 conveyed the other one-half interest to the River Authority. The City then condemned the River Authority's easement rights, and the record in that proceeding shows that, following the award of $88,753.18, the parties filed an agreement in lieu of the City's actual payment of the award at that time. They agreed "that all right, title and interest in and possession of the property and property rights condemned herein shall pass to and vest in the condemnor as of the date and time of this Award." Judgment was then rendered in the condemnation case that "the City of San Antonio * * * is hereby vested with and does hereby have judgment against * * * San Antonio River Authority, for all right, title and interest owned by the said San Antonio River Authority in and to the realty" in question.

▆▆▆ The transfer of an easement passes the title and vests it in another, but it does not necessarily interrupt the continuity or terminate it. Shahan v. Northern Texas Traction Company, 266 S.W. 850 (Tex.Civ.App.1924, writ dism.); St. Peter's Church v. Bragaw, 144 N.C. 126, 56 S.E. 688, 10 L.R.A.,N.S., 633 (1890); 1 C.J.S. Abandonment § 2. The undisputed documentary evidence, portions of which are quoted above, shows that each owner of the easement had an intent to pass title to the easements rather than an intent to abandon them.

▆▆▆ The landowners also suggest that, by the act of condemnation, the City itself caused the termination of the easements. The argument is that the easements were to endure so long as the grantee continued to use the easement for the stated purposes and those purposes were rendered impossible when the condemnor took the property. The argument was made in Hamman v. City of Houston, 362 S.W.2d 402 (Tex.Civ.App.1962, writ ref. n. r. e.) that the City of Houston by condemning a tract for highway purposes caused a reversion to the original grantor because the tract had been deeded as a park which purpose was defeated. The court held that

even though the condemnation of the land defeated the original purpose of a deed expressed in a condition subsequent, there was not a reversion to the grantor. The court cited a number of decisions outside of Texas which hold that a grantee who has not breached a condition subsequent is entitled to the award of any damages resulting from a condemnation, and the original grantor is not. See also City of San Antonio v. Congregation of Sisters of Charity of the Incarnate Word, 360 S.W.2d 580 (Tex.Civ.App.1962, writ ref. n. r. e.). The rule is stated in State by Mondale v. Independent School Dist. No. 31, 266 Minn. 85, 123 N.W.2d 121 (1963):

"As previously stated, the finding of the trial court that the use of the realty for the purposes specified in the deed had continued until the time of the taking by the state is supported by the evidence. Obviously, the condemnation of the tract by the state made impossible the continued use of the field for the purposes specified in the deed. However, it is uniformly held that realty does not revert where the use specified in the deed is discontinued solely because of a taking under the power of eminent domain."

■ The only other way that the easements could have been abandoned was by some act or omission to act by the owner of the easements which manifested an intent to abandon them. On July 13, 1967, the date the City took the easements, this record shows without dispute that the easements were being fully used. The earthen dams were being maintained and they were impounding water as they had continuously done since their construction. The flood and sedimentation controls continued until after the City took the fee from the Harrisons and Ruble. We hold that neither the San Antonio River Authority nor the City did or omitted to do any act which supports the conclusion that they intended to abandon the easements prior to the taking.

■ It is necessary, however, for us to determine the extent of the easements which the City took. The City states that the easements extended to the highest level the water could reach, that is, to the crest of the dams. That would be 496 feet above sea level in the case of the Ruble dam and 490 feet above sea level in the case of the Harrison dam. The landowners say that the limit of the easements is their historic high water mark, which is below the crest of the dams. It is our opinion that the easements permitted water up to the crest of the dam since that is the point to which the easements entitled the easement owners to raise the water level without a trespass upon the fee owners. Thew v. Lower Colorado River Authority, 259 S.W.2d 939 (Tex.Civ.App.1953, no writ); City of Anson v. Arnett, 250 S.W.2d 450 (Tex.Civ.App.1952, writ ref. n. r. e.); Kestler v. Verble, 52 N.C. 185 (1859); Vol. 2, Thompson on Real Property, § 681, (Perm. ed. 1939).

That part of the judgment of the court of civil appeals which held that the earthen structures were owned by the City has not been brought forward and is affirmed. We reverse that part of the judgment which declared the easements have terminated, and we render judgment that the City acquired the title to the easements by its taking on July 13, 1967.

GREENHILL, Justice (dissenting).

I respectfully dissent for the reasons set out in the able opinion of the Court of Civil Appeals. Tex.Civ.App. 443 S.W.2d 894.

McGEE, J., joins in this dissent.

STEAKLEY, Justice (dissenting).

I dissent in the view that the agreements in question authorize nothing more than a license to do certain things for certain purposes on the lands in question, and did not convey an easement interest in realty as presupposed in the majority opinion; that

disuser occurred when the City took the permissive rights for a predetermined destructive use, whereupon the rights lapsed; and that the landowners are entitled to recover the full value of their lands in the pending condemnation proceeding.

The problem is novel and inheres in long prior contracts by which Respondents or their predecessors in interest granted to the Alamo Soil Conservation District *"the right, privilege and authority* * to enter upon (the lands in question), construct, operate and maintain an Earthen fill dam and other structures for the retardation of the flow of floodwaters and reduction of sedimentation," which permission was to continue "for so long as the grantees, their successors and assigns, shall continue to use said easement or right-of-way for said purposes."

The retardation dams were subsequently constructed with government funds and formed permanent lakes with attendant benefits to the landowners of soil preservation, improvement of the land for purposes of pasturage, availability of water for cattle, and recreational opportunities. Years later, and for purposes of a different and inconsistent use in connection with public works identified as the Calaveras Creek Watershed Project, the City acquired the permissive rights by conveyances and "friendly" condemnation suits involving the Conservation District, the San Antonio River Authority and the City Public Service Board of San Antonio. The date of the taking of the rights was July 13, 1967, and the stated purpose was "the construction of a dam and reservoir which, as planned, will inundate the flood retarding structures located" on the Ruble and Harrison lands. The taking for this purpose obviously discontinued the uses for which permission was granted the Conservation District. Thereafter, on August 10 and November 8, 1967, the City took the Harrison and Ruble lands in a condemnation proceeding. This suit was instituted pending the appeal

of the landowners from the award of the Commissioners to obtain a judicial solution of the problem of whether the landowners were entitled to recover the full value of their lands or the value depressed by the previously authorized permissive rights. The majority has assumed that the permissive rights constituted interests in realty and has held that they burdened the lands until the actual inundation and destruction of the earthen dams and other structures following the construction of the Calaveras Creek dam and reservoir.

Cited in support of the majority opinion are Hamman v. City of Houston, 362 S.W. 2d 402 (Tex.Civ.App.—Fort Worth 1962, writ ref., n. r. e.); City of San Antonio v. Congregation of Sisters of Charity of the Incarnate Word, 360 S.W.2d 580 (Tex. Civ.App.—Waco 1962, writ ref., n. r. e.); and State by Mondale v. Independent School District, 266 Minn. 85, 123 N.W.2d 121 (Minn. 1963). I do not regard these cases as controlling or in point. Each involved a conveyance of fee title subject to a condition subsequent of forfeiture or abridgment. These grants are of the nature variously characterized as the retention of a possibility of reverter, or as a defeasible title in fee, or as a fee simple defeasible. As indicated in the quotation from the Minnesota case in the majority opinion, the problem in these cases is whether "realty" has reverted *"where the use specified in the deed* is discontinued solely because of a taking under the power of eminent domain." This is not the problem here. The original contracts quite clearly, it seems to me, give the Conservation District nothing more than a license—the "right, privilege and authority"—to engage in specific activities, and certainly not an interest in the lands themselves. The agreements did not purport to impose any conditions of defeasance affecting fee title, nor purport to convey an interest in the lands. The most that was granted was a permissive right to use the lands in certain particulars in furtherance of the program of retarding floodwaters and

---

* Italics are those of the writer throughout.

reducing soil sedimentation. The characteristics of an easement as distinguished from a license were stated in Settegast v. Foley Bros. Dry Goods Co., 114 Tex. 452, 270 S.W. 1014 (1925): ·

"An easement is a liberty, privilege, or advantage without profit which the owner of one tract of land may have in the lands of another. Though incorporeal, it is an interest in land, and must be created by grant, covenant, or agreement, express or implied.

"A license is a privilege or authority given to one or retained by one to do some act or acts on the land of another, *but which does not amount to an interest in the land itself.*"

The distinction I would draw here is illustrated in the case reported as Ropte v. Evans, in 67 S.W.2d 396 (Tex.Civ.App.— Austin 1934), and as Evans v. Ropte, in 128 Tex. 75, 96 S.W.2d 973 (1936). The agreement in question, in part, granted certain water rights with free access to the land to obtain the water, the exclusive use of a warehouse building on the land, and the right to erect other structures. The Court of Civil Appeals concluded:

"We do not think, however, that the rights granted to Apple under said contract amount to an easement, but rather constitute a mere license. While the distinction between a license and an easement as applied to real estate is sometimes rather subtle, generally an easement constitutes an interest in the land itself, while a license merely confers a privilege to do some act or acts upon the land without possessing any estate therein. Settegast v. Foley Bros., supra; 15 Tex. Jur. 775; 19 C.J. 871; 37 C.J. 279.

" * * * It is obvious, therefore, that Apple's rights of access to the premises, and his use thereof, were solely for the purpose of bottling and preparing for shipment the water in question, after it had been taken from the well by the owners of the land, had become personal property, and had been delivered to Apple on the premises. This we think constituted but a privilege or license upon the land and vested in Apple or his assigns no estate whatever in the land itself."

The Commission of Appeals, in an opinion adopted by the Supreme Court, reversed, holding:

"Looking at the contract as a whole and keeping in mind the dominant thing to be accomplished, to wit, *the sale of mineral waters in the land to the mutual benefit of all parties,* it grants by necessary implication, if not by express words, the right to enter upon the land and take and appropriate the mineral waters within same, and to do everything necessary and appropriate for the accomplishment of that purpose. This right to take and appropriate the waters was practically unlimited and exclusive, * * *

"It seems to be almost universally recognized that a right created by grant to enter upon land and take and appropriate the waters of a spring or well thereon amounts to an interest in real estate, regardless of the term by which such right may be designated. In some states it is held to be an easement, but in other cases it is held to be more than an easement. In all events, it is an interest in land."

The decision of the Commission of Appeals, citing Texas and P. Ry. Co. v. Durrett, 57 Tex. 48 (1882), turned on its construction of the contract as granting something more than the right to do something on the land, namely, "the right to take something out of and from the soil, which is known in the books as a profit a prendre—a right coupled with a profit." This element is not present in the contract between the landowners and the Conservation District.

As said in Ropte v. Evans, supra, the difference between an easement interest in land, and a license or privilege to enter upon and use the land for a specific purpose, is often subtle and indecisive. This is illus-

trated again by Markley v. Christen, 226 S.W. 150 (Tex.Civ.App.—San Antonio 1920, writ dism.). The case involved an agreement for the construction of a pumping plant and pipeline for the mutual benefit of the contracting parties. A trial court finding adopted by the Court of Civil Appeals was to the effect that there was an express agreement for an easement. The Court of Civil Appeals found it unnecessary to decide whether the contract "amounted to a mere license," saying that "[w]hile the facts might not create an easement, which implies an interest in land, and a license does not, still appellees have rights created by parol which would justify the judgment." The reasoning of the court was this:

> "*The license to erect the improvements* was executed, and it is held that to permit a revocation after an execution would be to permit a palpable fraud, and this is intensified where the licensor, not only grants the right to the licensee to go on the land, but joins in the enterprise and accepts the benefits of the licensee's labor and expense. As said in Appeal of Clelland, 133 Pa. 189, 19 Atl. 352, 7 L.R.A. 752:

> 'A right of this character, while not strictly an easement, is in the nature of one. *It is really a permission or license, express or implied, to use the property of another in a particular manner, or for a particular purpose.* Where this permission has led the party to whom it has been given to treat his own property in a way in which he would not otherwise have treated it, as by the erection or construction of permanent improvements thereon, it cannot be recalled to his detriment. Having expended his money upon the faith of it, and not being able to be restored to his original position, equity will not allow the permission to be revoked, in breach of such faith. This has given rise to the doctrine of executed or irrevocable licenses.' "

Here, the question of whether the rights granted the Conservation District constituted an easement interest in land, or a license or privilege to use the land for certain purposes, must be decided in order to determine whether the landowners are entitled to recover the full value of their land in the pending condemnation proceeding. I would resolve the question in favor of the landowners. The problem is basically one of ascertaining the intent of the parties. In doing so, attention may be paid not only to the terms of the underlying agreement, but to the surrounding circumstances and the purposes sought to be accomplished by the parties. Varying the terms of a written instrument is not involved since we are not determining what the parties bound themselves to do, but merely whether the parties intended the subject of their agreement to be an interest in land. An important circumstance is whether the conveyance of an interest in land was essential to the purposes of the party acquiring the right. Quite plainly, the Conservation District sought only the right to erect structures which would accomplish its statutory purpose of providing for "the conservation of soil and soil resources of this State, and for the control and prevention of soil erosion, and thereby to preserve natural resources, control floods, * * *" See Article 165a–4, Sec. 2(d), Vernon's Annotated Texas [Civil] Statutes. Its whole object was to preserve, not take from the soil. The rights so granted to the District were precisely described in these terms, namely, "the right, privilege and authority to enter upon, construct, operate and maintain an Earthen fill dam and other structures for the retardation of the flow of floodwaters and reduction of sedimentation." The accomplishment of the objectives of the District required no more than permission to erect the necessary structures. The District had not profit motive and there is no problem of recalling the permission to the detriment of the District since the District itself was a willing party to the acquisition of the rights by the City for an avowed contrary use.

In my view, then, the problem is not one involving the abandonment of an easement, or the reversion or forfeiture of an interest in realty; it is whether the permissive rights lapsed when taken by the City for a predetermined destructive use. I would hold that the disuser was complete when the City condemned and acquired the rights for uses requiring the inundation and destruction of the earthen dams and other structures erected by the Conservation District, and that the landowners are entitled to the full value of their lands in the pending condemnation proceeding.

I would therefore affirm the judgment of the Court of Civil Appeals.

On Motion For Rehearing

POPE, Justice.

J. A. Ruble and Reese L. Harrison by their motions for rehearing ask this court to make a more complete declaration of the nature of the easements which we have held are burdens upon the fee ownership of their lands. This should be done.

The easements authorized the construction, operation and maintenance of an earthen fill dam upon the lands for retarding the flow of floodwaters and the reduction of sedimentation. In the case of the Ruble lands, the easement authorized a sedimentation pool and inundation up to the 477.5 foot contour line with a further easement right for temporary and periodic inundations following heavy rains up to the 496 foot contour line. In the case of the Harrison lands, the easement authorized a sedimentation pool and inundation up to the 468.6 foot contour line with a further easement right for temporary and periodic inundations following heavy rains up to the 489 foot contour line.

The fee owners of both the Harrison and Ruble lands retained the right of free access to and upon the fresh waters impounded by the dam including the right to the free and unrestricted use of the waters for recreation, watering livestock and the irrigation of their adjoining lands.

The motions for rehearing correctly say that our opinion stated that the landowners appealed from the awards of the Commissioners in the proceedings to take their fee interests when, in fact, the City appealed.

The motions for rehearing are granted in part, and the judgment is corrected as expressed above. The motions are otherwise overruled.