

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-24-00393-CV

_____

CITY OF DENTON, Appellant

V.

JESUS MANUEL RODRIGUEZ-RIVERA, Appellee

On Appeal from the 431st District Court
Denton County, Texas
Trial Court No. 22-8751-431

Before Kerr, Birdwell, and Bassel, JJ.
Opinion by Justice Birdwell

## OPINION

## I. Introduction

In this interlocutory appeal, Appellant City of Denton complains of the trial court's order denying its plea to the jurisdiction. In its plea, the City sought the dismissal, with prejudice, of Appellee Jesus Manuel Rodriguez-Rivera's negligence and negligence per se causes of action in which he sought compensatory damages for personal injuries suffered when a City employee backed a bulldozer into the front driver's side of his truck while he was waiting to dump a container full of trash at the City's landfill. Despite his having alleged a "motor-driven vehicle" waiver of the City's governmental immunity pursuant to the Texas Tort Claims Act, *see* Tex. Civ. Prac. & Rem. Code Ann. §§ 101.021(1), 101.0215(a)(6), the City urged by its plea that, because Rodriguez-Rivera was engaged in the recreational activity of "off-road automobile driving" at the time of the collision, the City maintained its immunity due to his failure, by pleading or proof, to meet the heightened evidentiary threshold of "gross negligence" established by the Texas Recreational Use Statute, *see id.* §§ 75.001–.003. Since we conclude that by waiting in his truck to dump a load of trash at the City's landfill Rodriguez-Rivera was not engaged in such "pleasure driving" as contemplated by Section 75.001(3)(H) of the statute, the heightened jurisdictional threshold urged by the City for the waiver of its immunity does not apply. We accordingly affirm the trial court's denial of the City's plea.

## II. Background

### A. Rodriguez-Rivera's Factual Allegations

By way of his original petition, Rodriguez-Rivera alleged that he was seriously injured in a collision with a bulldozer, which was driven by the City's employee, when he was stopped in his pickup truck and trailer while waiting to dump a container of trash at the City's landfill. He further alleged that due to the City employee's inattention, the rear of the bulldozer crashed into the front driver's side of his truck, violently throwing him about the cab and causing him serious personal injuries. Rodriguez-Rivera further alleged that due to the sudden and unexpected nature of the bulldozer's movement, he was unable to take evasive action to avoid the collision.

To assist the trial court in visualizing the collision as alleged, Rodriguez-Rivera included in his petition the following image prepared by the investigating officer from the Denton Police Department; it was modified to more specifically identify the vehicles involved:



The image depicts the relative positions of the bulldozer immediately before, during, and after the collision, with Rodriguez-Rivera's truck and trailer remaining stationary throughout. According to Rodriguez-Rivera, the investigating officer concluded that the City employee "caused the crash when he decided to back [the] bulldozer without looking, without safety, and without a legal right to do so according to the rules of the road."

Rodriguez-Rivera subsequently amended his petition to allege that at the time of the collision, he operated JR Services—a container business that rented trash containers on a per diem basis. At the end of the rental term, he picked up the containers, averaging three tons of trash, and took them to the City's landfill for dumping, paying a fee for their disposal. He further alleged that at the time of the

4

collision, he had driven his truck and trailer to the area of the landfill where trash was being dumped.

Rodriguez-Rivera's amended petition also included still photographs from videos taken from (1) the rear of the bulldozer and (2) another source that showed the collision itself. The stills from the latter show the bulldozer's backing into, colliding with, and pulling away from Rodriguez-Rivera's truck and trailer, which are stopped in the middle of an expansive flat area of the landfill. In the last two of these stills, the bulldozer is pulling away from Rodriguez-Rivera's truck and there is considerable damage to his truck's front driver's side, windshield, and hood; indeed, the hood of the truck appears to have been peeled completely away from the front driver's side to the front passenger's side, leaving the engine compartment open to the air. This damage is similarly reflected in the two stills from the rear of the bulldozer.

## B. Rodriguez-Rivera's Legal Contentions

To recover compensatory damages for his personal injuries, Rodriguez-Rivera alleged negligence and negligence per se causes of action arising from the bulldozer operator's inattention for which Rodriguez-Rivera sought to hold the City vicariously liable under the doctrine of respondeat superior, observing that Section 101.106 of the Tort Claims Acts effectively barred suit against the City employee directly for his negligence. Rodriguez-Rivera had previously alleged that the City is a "government municipality" subject to the express waivers of governmental immunity established by

Sections 101.021 "and/or" 101.0215 of the Tort Claims Act.[1] In so pleading, he had alleged that his injuries (1) had been proximately caused by the wrongful acts, omissions, or negligence of a City employee acting within the course and scope of his employment and (2) arose from the operation or use of a motor-driven vehicle (3) for which the employee would have been personally liable to him under Texas law. Rodriguez-Rivera further alleged that he had met all conditions precedent to the filing of this lawsuit, including giving written notice of his claim within six months of the collision by completing an incident report and by obtaining a claim number.

---

[1]Section 101.021(1) establishes that a governmental unit such as the City is liable for property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within the scope of his employment if the property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle or motor-driven equipment and the employee would be personally liable to the claimant according to Texas law. Tex. Civ. Prac. & Rem. Code Ann. § 101.021(1). Section 101.0215(a)(6) establishes that a municipality

> is liable for damages arising from its governmental functions, which are those functions that are enjoined on a municipality by law and are given it by the state as part of the state's sovereignty, to be exercised by the municipality in the interest of the general public, including . . . garbage and solid waste removal, collection, and disposal.

*Id.* § 101.0215(a)(6); *see Tooke v. City of Mexia*, 197 S.W.3d 325, 343 & n.91 (Tex. 2006) ("For purposes of tort liability, the Legislature has statutorily included 'garbage and solid waste removal, collection, and disposal' among a municipality's governmental functions."). To hold a municipality liable under Section 101.0215(a)(6), however, liability must arise out of one of the specific areas of waiver listed under Section 101.021. *Fox v. City of Austin*, No. 03-06-00172-CV, 2006 WL 3452556, at *3 n.2 (Tex. App.—Austin Dec. 1, 2006, no pet.) (mem. op.); *see also McKinney v. City of Gainesville*, 814 S.W.2d 862, 865 (Tex. App.—Fort Worth 1991, no writ) (rejecting argument that Section 101.0215 provides a waiver of governmental immunity independent of Section 101.021).

## C. The City's Plea to the Jurisdiction

By way of its plea to the jurisdiction, the City asserted that the Recreational Use Statute raised the jurisdictional threshold for the waiver of its governmental immunity to pleading and proof of gross negligence by defining "recreation" to include "pleasure driving, including . . . off-road automobile driving," and it characterized Rodriguez-Rivera's "off-road automobile driving on City property and attempting to dump his trash container" as recreation subject to this heightened threshold. Observing that Rodriguez-Rivera had not pleaded that the collision occurred due to the gross negligence of the City employee, the City argued that Rodriguez-Rivera had additionally conceded that the City employee was merely inattentive, not grossly negligent, and relied on the following testimony from Rodriguez-Rivera's deposition:

> [The City employee] never looked back. He – I mean, he could – he could have seen me, but he never looked back. He – as a matter of fact, he didn't even – he didn't even feel when he hooked me. When he hit my truck, he never – he never saw that. He – he never acknowledged. He never fe[lt] it. That machine is so big, so heavy[,] he went back, hooked my truck and dr[o]ve forward about 20 feet, and he didn't even acknowledge that he – that he hit me. Some people – some of the workers have to – told him and tell him, stop, stop, stop, and then he stopped and looked back and saw me.

When asked whether he thought the City employee had purposely tried to run into him, Rodriguez-Rivera testified, "I don't think so. I don't think he did purposely. But do I . . . think he made a mistake? Yes." Based upon this testimony, the City argued that its employee did not have knowledge of an extreme degree of risk or act with conscious indifference, and absent such pleading and proof, there was no waiver of

7

governmental immunity supporting the trial court's exercise of subject-matter jurisdiction.

Finally, to demonstrate that Rodriguez-Rivera was driving his truck "off-road" on City property at the time of the collision, the City attached a postcollision panoramic photograph of the bulldozer and Rodriguez-Rivera's truck, taken from a position some distance from but directly behind and to the passenger's side of his truck. The bulldozer is perpendicular to the front of the truck, and the bulldozer's blade is to the driver's side. Both vehicles are at the front of an expansive pile of bulldozed trash, and the pile in turn occupies the bottom of a long sloping hill. Additional bulldozers are working other portions of the pile, and two dump trucks are backed up to the pile. There is no apparent road for ingress or egress to the area, but there are numerous vehicle tracks across the terrain.

Based upon this evidence and the absence of any pleading of gross negligence, the City urged the trial court to dismiss Rodriguez-Rivera's negligence and negligence per se claims with prejudice.

## D. Rodriguez-Rivera's Response

Rodriguez-Rivera filed a response to the City's plea with additional jurisdictional evidence. Arguing that his dumping of trash containers at the City's landfill was not a recreational activity subject to the Recreational Use Statute, Rodriguez-Rivera's response attached excerpts from his deposition testimony describing the nature of his container business and his commercial use of the City's

landfill. As noted above, clients throughout Denton County rent his containers for trash collection, and he hauls the filled containers to the City's landfill where he empties them. The City weighs each container when he enters the landfill, and he pays a fee when he leaves, having dumped, on average, three tons of trash.

Rodriguez-Rivera's response also attached the Texas Peace Officer's Crash Report, which sets forth the "Investigator's Narrative Opinion of What Happened":

> This crash occurred on the private property for the City of Denton. This crash occurred on top of the dirt trash mountain where vehicle[]s were lined up waiting to dump. Unit #3 is a CAT 973D Bulldozer. Unit #1 and #2[—Rodriguez-Rivera's truck and trailer, respectively—]were facing eastbound waiting to make a 180 degree turn to the right to back up and unload. Unit #3 was facing east to northeast and was backup [sic] up clearing debris from the area. Unit #3 then made a sharp turn to the south and struck the front left quarter panel of Unit #1[,] pushing Unit #1 to the south. Unit #3 then began to pull forward and pulled Unit #1[,] causing severe damage to the hood area. Unit #3 then broke loose from Unit #1 and began making a turn to the west when the operator noticed that Unit #1 had been struck. Driver of Unit #1 stated that he was sitting still when he was struck by Unit #3. Operator of Unit #3 stated that he thought that Unit #1 might have been moving forward when the crash occurred. Officer believes that Unit #3 backed without safety.

The officer's report included a field diagram of the collision, which was the diagram that was modified in Rodriguez-Rivera's original and amended petitions to identify the vehicles.

Based upon his amended pleading and the evidence presented, Rodriguez-Rivera urged the trial court to hold the Recreational Use Statute inapplicable to the circumstances of the collision and to deny the City's plea.

**E. The Trial Court's Ruling**

The trial court conducted a hearing on the City's plea. During the hearing, the trial court framed the jurisdictional issue concerning the applicability of the Recreational Use Statute in the following manner:

> [H]ere[,] I have an individual who as part of his business was hauling a large trailer full of debris as part of his business that he needed to discard at the City of Denton's landfill. I'm having a hard time understanding how that drive to or from discarding debris falls within the concept of recreation merely because it's off-road.

Counsel for the City responded by urging the application of *University of Texas v. Garner*, 595 S.W.3d 645 (Tex. 2019), wherein the Supreme Court of Texas held that a bicyclist who was bicycling on a street through a university-owned apartment complex was engaged in "recreation" within the meaning of the Recreational Use Statute when she was injured by a university employee who backed his vehicle into her. *See id.* at 648, 651. The supreme court concluded that the bicyclist's intent of mere transportation, not recreation, was irrelevant to the statute's application because the Texas Legislature had expressly listed "bicycling" as a form of recreation and had specifically reduced the duty owed to her as that owed to a trespasser on its premises. *Id.* at 650. Applying this reasoning, counsel for the City argued that all that mattered was that Rodriguez-Rivera was driving his truck "off-road" on City property when the collision occurred, and his intent in dumping trash was irrelevant.

Appearing unconvinced, the trial court focused on the legislature's use of the phrase "pleasure driving" in association with "off-road automobile driving" and offered certain hypotheticals suggesting a distinction from *Garner*:

> And I think I get and follow all that and I'm not questioning the decision tree that exists in Texas law and the relative duty of care that would apply. My question was more how does a person driving his pickup truck while hauling a trailer full of trash across a landfill constitute recreation as compared to a student riding her bicycle across a university-owned lot? Riding a bicycle, it's easy to see how that fits within recreational use. Driving a Jeep across a landfill, especially in an urban setting where there's not larges swaths of land to enjoy off-roading of a vehicle, that's a recreational use, that's easy to understand, but, again, simply hauling trash, it's hard to imagine how that fits within any of these categories, so I'm trying to catch up with the case that you mentioned, so let me -- give me the citation of that [s]upreme [c]ourt case.
>
> . . . .
>
> . . . Okay. And you of course touched something near and dear to the [c]ourt's heart, which is strict construction of statutes and that -- and you've informed me that that would dictate my decision, which I would agree if it applies, but I look at H, and H is pleasure driving, . . . right? Pleasure driving, including off-road motorcycling and off-road automobile driving and the use of off-highway vehicle[s]. So this was not a motorcycle. It was not an off-highway vehicle. It was simply off-road vehicle, which I guess automobile covers a truck.
>
> Okay. So this involves an off-road pickup truck hauling a trailer. And, again, I get to the question in the strict construction, how is that pleasure driving? Where do I find a case that construes pleasure driving to include that? I mean, again, riding a bicycle is easy to understand. That's pleasure even if you have a cart attached to it because there are so many alternative ways to commute. A decision commonly to ride a bicycle would be done because of recreational pleasure or athletic reasons. I'm trying to find a case or logic that tells me that hauling trash to the dump in a pickup truck is pleasure.

Counsel for the City conceded that he had not been able to find such a case.

Returning to *Garner*'s holding that the subjective intent of the alleged recreant does not determine whether a particular activity constitutes recreation, the trial court offered another hypothetical:

> Okay. The subjective intent does not control. So if Mr. Rodriguez-Rivera subjectively had his windows down to enjoy the fresh air at the landfill and was crossing for his own personal recreation and he testified to that, that would not dictate, right? Because his subjective intent doesn't matter.

Counsel for the City agreed, concluding, "The City does allege that him being there and enjoying the premises in being able to dump that trash is also going to classify him as a recreational user."

When given the opportunity to respond, counsel for Rodriguez-Rivera conceded that he had failed to find any case that interpreted "recreation" in the context of the operation or use of landfills but generally agreed with the distinctions drawn by the trial court's hypotheticals, posing one of his own:

> Now, if my client had testified in deposition that he did a couple of donuts with his truck before pulling in to unload, I mean, you might have a possible -- you'd have a real issue, I think, then, but he didn't. He's just doing his job.

The trial court then asked, if Rodriguez-Rivera had been "in a Jeep Wrangler 4-wheel drive doing donuts, as you said, and he got hit by a piece of equipment," would such activity lead to a waiver of the City's governmental immunity, and counsel conceded it would not.

12

Following the conclusion of the hearing, the trial court signed an order denying the City's plea.

### III. Jurisdictional Challenge

The City complains on appeal that because the record conclusively established that Rodriguez-Rivera had engaged in a recreational act on the City's property, that he had done so as a recreational user, and that he had failed to raise an issue of fact demonstrating any grossly negligent acts attributable to the City, the trial court erred by denying its plea to the jurisdiction.[2] Because the record reveals no pleading or proof of gross negligence attributable to the City, our review of the trial court's ruling depends upon the applicability of the Recreational Use Statute. Because the trial court properly framed, analyzed, and determined the question before us, we hold that the statute does not apply.

### A. Standard of Review

"Whether a court has subject[-]matter jurisdiction is a question of law." *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). Because governmental immunity from suit defeats a trial court's subject-matter jurisdiction, a jurisdictional challenge on that basis is properly raised by a plea to the jurisdiction. *See id.* at 225–26; *Town of Little Elm v. Climer*, No. 02-23-00250-CV, 2023 WL 8467513, at *2 (Tex. App.—Fort Worth Dec. 7, 2023, no pet.) (mem. op.). A plea to the

---

[2]Although the City sets forth two issues in its brief, we construe them as a single issue challenging the trial court's denial of its plea to the jurisdiction.

13

jurisdiction "is used to defeat a cause of action without regard to whether the claims asserted have merit." *Sullivan v. City of Fort Worth*, No. 02-10-00223-CV, 2011 WL 1902018, at *2 (Tex. App.—Fort Worth May 19, 2011, pet. denied) (mem. op. on reh'g).

When a plea to the jurisdiction challenges the pleadings, we determine if the pleader has alleged facts that affirmatively demonstrate the court's subject-matter jurisdiction to hear the cause of action asserted. *Miranda*, 133 S.W.3d at 226. In so doing, we construe the pleadings liberally in favor of the plaintiff, looking to the pleader's intent. *Id.* If, however, a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issue raised, as the trial court is required to do. *Id.* at 227. When the jurisdictional challenge implicates the merits of the plaintiff's cause of action and the plea to the jurisdiction includes evidence, the trial court reviews the relevant evidence to determine if a fact issue exists. *Id.*

"The plea to the jurisdiction standard generally mirrors that of a traditional motion for summary judgment." *Sullivan*, 2011 WL 1902018, at *2 (first citing *Miranda*, 133 S.W.3d at 228; and then citing Tex. R. Civ. P. 166a(c)). To establish governmental immunity as a proper evidentiary basis for dismissal, the governmental unit must meet the summary-judgment standard of proof. *Id.* "Once the governmental unit meets its burden, the plaintiff is then required to show there is a disputed material fact regarding the jurisdictional issue." *Id.* We take as true all evidence favorable to the

14

nonmoving plaintiff, and we indulge every reasonable inference and resolve any doubts in its favor. *Id.* (citing *Wise Reg'l Health Sys. v. Brittain*, 268 S.W.3d 799, 805 (Tex. App.—Fort Worth 2008, no pet.)). If the evidence raises an issue of jurisdictional fact, the trial court must deny the governmental unit's plea and leave its resolution to the finder of fact. *Id.* "But if the evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law." *Id.*

Finally, when the jurisdictional challenge involves the interpretation of statutory language, we review the trial court's interpretation de novo to ascertain and give effect to the legislature's intent. *Id.* at *5 (citing *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625 (Tex. 2008)). We interpret the statute according to the plain meaning of its words unless a contrary intention is evident from the context, or unless such an interpretation leads to an absurd result. *Id.*

## B. Applicable Law

The Tort Claims Act provides a limited waiver of sovereign or, in the case of municipalities such as the City, governmental immunity.[3] Tex. Civ. Prac. & Rem.

---

[3]Though often used interchangeably, the terms "sovereign immunity" and "governmental immunity" protect distinct entities. *Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 694 n.3 (Tex. 2003). Sovereign immunity refers to the State's immunity from suit and liability and extends to the various divisions of state government, including agencies, boards, hospitals, and universities. *Id.* "Governmental immunity, on the other hand, protects political subdivisions of the State, including counties, cities, and school districts." *Id.* Because the City of Denton is a political subdivision of the State, we limit our analysis to governmental immunity.

15

Code Ann. §§ 101.001–.109. The Act expressly waives immunity in three general categories: (1) use of publicly owned automobiles, (2) premises defects, and (3) injuries or death arising out of the condition or use of property. *See Miranda*, 133 S.W.3d at 225. More specifically, the first category includes "the operation or use of a motor-driven vehicle or motor-driven equipment"—whether the offending operation or use took place on real property owned or subject to the control of the governmental unit—while the third category includes the "use of . . . real property" owned or subject to the control of the governmental unit—whether the offending premises activity included the use or operation of a motor-driven vehicle or motor-driven equipment. *See* Tex. Civ. Prac. & Rem. Code Ann. § 101.021(1)(A), (2). In other words, the first and third categories can overlap when, as here, the injury made the basis of the plaintiff's claim arises due to negligent premises activity involving the operation or use of a motor-driven vehicle by an employee of a city or other municipality. *See DeWitt v. Harris County*, 904 S.W.2d 650, 653 (Tex. 1995) (holding that the inclusion of the "use" language in subsection (2) was intended by the legislature to impose liability for the negligent actions of an employee based upon principles of respondeat superior); *City of Carrollton v. Hamrla*, No. 02-15-00119-CV, 2016 WL 93031, at \*4–5 (Tex. App.—Fort Worth Jan. 7, 2016, pet. denied) (mem. op.) (holding that bulldozer qualified as a "motor-driven vehicle" or "motor-driven equipment" for waiver purposes).

Applicable to both categories, Section 101.058 of the Tort Claims Act further modifies the waiver of immunity from suit by imposing the limitations of liability articulated in the Recreational Use Statute, thereby effectively establishing a heightened jurisdictional threshold for suing governmental units such as municipalities. *See* Tex. Civ. Prac. & Rem. Code Ann. § 101.058 ("To the extent [the Recreational Use Statute] limits the liability of a governmental unit under circumstances in which the governmental unit would be liable under [the Tort Claims Act], [the Recreational Use Statute] controls."); *id.* § 75.003(g) (same); *Miranda*, 133 S.W.3d at 225. "The Recreational Use Statute limits the governmental unit's liability as a premises owner if the plaintiff engages in recreation on the premises." *Town of Little Elm*, 2023 WL 8467513, at *2. And the statute expressly includes "pleasure driving, including off-road motorcycling and off-road automobile driving and the use of off-highway vehicles" in the definition of recreation. Tex. Civ. Prac. & Rem. Code Ann. § 75.001(3)(H).

"As applied to government landowners with immunity from suit and liability, the statute's effect is to limit the scope of the Tort Claims Act's waiver of that immunity 'by classifying recreational users as trespassers and requiring proof of gross negligence, malicious intent, or bad faith.'" *Garner*, 595 S.W.3d at 648 (quoting *Suarez v. City of Texas City*, 465 S.W.3d 623, 627 (Tex. 2015)); *see* Tex. Civ. Prac. & Rem. Code Ann. § 75.002(d). This reclassification applies even if the alleged recreant entered the premises for some purpose other than recreation. *City of Bellmead v. Torres*, 89 S.W.3d

17

611, 613–14 (Tex. 2002). If the Recreational Use Statute applies but the plaintiff fails to plead or provide evidence of gross negligence attributable to the governmental unit, then the trial court lacks subject-matter jurisdiction due to the nonwaiver of governmental immunity. *See Garner*, 595 S.W.3d at 649–51 (dismissing the plaintiff's claims for lack of jurisdiction due to her failure to plead and prove gross negligence attributable to the governmental unit); *Suarez*, 465 S.W.3d at 637 (same).

## C. Analysis

Relying exclusively upon Section 75.001(3)(H) of the Recreational Use Statute, the City argues that Rodriguez-Rivera was engaged in "recreation" at the time of the collision because, regardless of his purpose in driving his truck "off-road" on landfill premises, this activity constituted "pleasure driving, including . . . off-road automobile driving" and thereby raised the jurisdictional threshold for waiver of its governmental immunity to acts or omissions of gross negligence.[4] Rodriguez-Rivera responds that because he was solely engaged in a purely commercial activity on municipal premises not open to the public for recreational purposes, he was not a recreational user to whom the Recreational Use Statute applied. Neither party addresses the meaning of the phrase that we conclude is dispositive of this issue: pleasure driving.

### i. Canons of construction

---

[4]Although the City argues that the "off-road" nature of Rodriguez-Rivera's driving is dispositive of our analysis, we observe that the phrase "pleasure driving" is not so qualified and that the Recreational Use Act defines "premises" to include roads. *See* Tex. Civ. Prac. & Rem. Code Ann. § 75.001(2).

As an initial matter, the Recreational Use Statute does not define the phrase "pleasure driving" as used in Section 75.001(3)(H). Under such circumstances, we may determine the plain meaning of the phrase by consulting dictionary definitions, if available. *See City of Midland v. Bunch*, No. 11-16-00276-CV, 2017 WL 4440276, at *2–3 (Tex. App.—Eastland Sept. 29, 2017, no pet.) (mem. op.) (relying on dictionary definition of "associate" in holding that, at the time of his injury, plaintiff was involved in "recreation" subject to the Recreational Use Statute by either swimming or sitting "on a 'bench in the swimming area'" as "an activity associated or closely related to swimming or enjoying the outdoors"). We are also compelled by the Code Construction Act to read the phrase in context and to construe it according to the rules of grammar and common usage. Tex. Gov't Code Ann. § 311.011(a). To the extent the phrase has otherwise "acquired a technical or particular meaning," it must be construed accordingly. *Id.* § 311.011(b). And to the extent the legislature employed the terms "includes" or "including" to associate specific examples with the phrase, those "are terms of enlargement and not of limitation or exclusive enumeration, and use of the terms does not create a presumption that components not expressed are excluded." *Id.* § 311.005(13); *see Sneed v. Webre*, 465 S.W.3d 169, 190 (Tex. 2015).

Moreover, because the rules set forth by the Code Construction Act are not exclusive, *see* Tex. Gov't Code Ann. § 311.003, we may consider the principles of *noscitur a sociis* when interpreting a phrase intentionally associated with examples by the legislature, *see Sullivan*, 2011 WL 1902018, at *7. "The canon of statutory construction

19

known as *noscitur a sociis*—'it is known by its associates'—holds that the meaning of a word or phrase, especially one in a list, should be known by the words immediately surrounding it." *Greater Hous. P'ship v. Paxton*, 468 S.W.3d 51, 61 (Tex. 2015); *Sullivan*, 2011 WL 1902018, at \*7 ("*Noscitur a sociis* means that the meaning of particular words in a statute may be ascertained by reference to other words associated with them in the same statute."). "We rely on this principle to avoid ascribing to one word [or phrase] a meaning so broad that it is incommensurate with the statutory context." *Paxton*, 468 S.W.3d at 61. And when the association involves one phrase qualifying an immediately preceding phrase, the canon of statutory construction known as the doctrine of the last antecedent states that the qualifying phrase must "be confined to" or consistent with the phrase immediately preceding it to which it may, without impairing the meaning of the sentence, be applied. *See City of Corsicana v. Willman*, 216 S.W.2d 175, 176 (Tex. 1949). Regardless, we attempt to discern what the legislature intended by including certain exemplar activities within the pleasure driving category for recreation.

### ii. "Pleasure driving" historically

The difficulty here arises because "pleasure driving" is both a qualifying and a qualified phrase for purposes of statutory interpretation: qualified by the phrase "off-road automobile driving" as a specific example thereof, yet previously qualifying the terms "recreational purpose" and "recreation" without reference to any definition or specific examples. Originally enacting the Recreational Use Statute in 1965 to open

20

private land for the recreational purposes of hunting, fishing, and camping, the legislature amended the definition of "recreational purpose" in 1981 to add "pleasure driving" to the list of activities subject to its provisions. *Univ. of Tex. at Arlington v. Williams*, 459 S.W.3d 48, 52–53 & n.2 (Tex. 2015) (citing Act of May 30, 1981, 67th Leg., R.S., ch. 349, § 2, sec. 6(b), 1981 Tex. Gen. Laws 934 (amending former Tex. Rev. Civ. Stat. Ann. art. 1b)). The source of the phrase appears to be Section 2(c) of model legislation proposed by the Council of State Governments in 1965 to encourage recreational use of private lands. *See Sallee v. Stewart*, 827 N.W.2d 128, 135–36 (Iowa 2013) (quoting Council of State Governments, *Public Recreation on Private Lands: Limitations on Liability*, 24 Suggested State Legis. 150, 151 (1965), as defining "recreational purpose" to include "hunting, fishing, swimming, boating, camping, picnicking, hiking, pleasure driving, nature study, water skiing, winter sports, and viewing or enjoying historical, archaeological, scenic or scientific sites"); *see also* Michael K. Davis, *Landowner Liability under the Wyoming Recreational Use Statute*, 15 Land & Water L. Rev. 649, 650–52, 652 n.16, 660 (1980) (observing that the model legislation's definition of "recreational purpose" was "adopted verbatim" by the Wyoming Legislature in 1965).

The model legislation, in turn, appears to have employed the phrase as a term of art historically associated with the creation by municipal ordinance of boulevards or parkways as scenic thoroughfares restricting or excluding commercial traffic in favor of pleasure driving:

> Pleasure and recreation are not only essential to health[] but tend to the improvement of character. No better instance of a public use can be given than that of a public square or park in the midst of, or convenient to, a dense population. Private property may be taken for the purpose of securing such means of recreation and health. A park is a public use, though not located in a city or town[] but only in the vicinity of it. Land may be taken on each side of a highway to be kept open for court yards and ornament. *Highways may be laid out for the purpose of affording access to a position which commands a fine view or for accommodating pleasure driving.*

John Lewis, *A Treatise on the Law of Eminent Domain in the United States* § 271(175), at 539 (3d ed. 1909) (emphasis added) (footnotes omitted); *see Cicero Lumber Co. v. Town of Cicero*, 51 N.E. 758, 760–62 (Ill. 1898) (upholding constitutionality of statute authorizing municipalities to designate by ordinance certain "streets, roads, avenues, boulevards or highways, under their jurisdiction, as a public driveway, to be used for pleasure driving only"); *see also Griffith v. Allison*, 96 S.W.2d 74, 77 (Tex. [Comm'n Op.] 1936) (observing that limited and conditional dedication of ocean front strip of land included parkway intended "to be used for walking, driving, riding, and for pleasure purposes").[5] Thus, as employed in the model legislation, the phrase "pleasure driving"

---

[5]Although not included in legal dictionaries or digests as a phrase to be defined, such authorities historically employed "pleasure driving" to define other legal terms and phrases. *See Boulevard*, Black's Law Dictionary 168 (5th ed. 1979) ("Term now generally refers to a street or highway with park-like appearance; or one specially designed for pleasure walking or driving; often landscaped."); *Boulevard*, Ballentine's Law Dictionary 151 (3rd ed. 1969) ("A street or highway more elaborate than the ordinary highway or street in respect both of width, style, and manner of construction. . . . It may be given a parklike appearance by reserving spaces at the sides or center for shade trees, flowers, seats, and the like, and be set apart for pleasure driving rather than the general purposes of traffic." (citing *Haller Sign Works v. Physical Culture Training Sch.*, 94 N.E. 920, 923 (Ill. 1911)); *Parkway*, Ballentine's Law Dictionary 913 (3rd ed. 1969) ("A boulevard. A highway designed especially for travel

22

obtained a particular meaning associated with driving for recreation or relaxation, a meaning clearly distinct from commercial activity.

### iii. Associational amendments and limited Texas caselaw

Unfortunately, as acknowledged by both counsel during the hearing on the City's plea, there appear to be no Texas cases interpreting the phrase "pleasure driving" under the Recreational Use Statute as a singular category of recreation unassociated with specific examples. This is true despite the legislature's codifying it as a form of "recreation" in 1985 and extending the protections of the codified statute to publicly held land in 1995.[6] *See Williams*, 459 S.W.3d at 53 & nn.6–7 (first citing Act of

for pleasure and recreation, although not limited to such use in the absence of express regulation to that effect."); *Pleasure drive*, Ballentine's Law Dictionary 955 (3rd ed. 1969) ("See boulevard; parkway."); *Boulevard*, Black's Law Dictionary 232 (4th rev. ed. 1968) ("A street or highway with park-like appearance; or one specially designed for pleasure walking or driving." (first citing *Newbold v. Brotzge*, 272 S.W. 755, 757 (Ky. 1925); and then citing *Chaplin v. Kansas City*, 168 S.W. 763, 766 (Mo. 1914) (holding "boulevard" and "parkway" synonymous))); *Parkway*, Black's Law Dictionary 1272 (4th rev. ed. 1968) ("An ornamental part of a street which may be used for recreation purposes." (citing *Kupelian v. Andrews*, 135 N.E. 502, 503 (N.Y. 1922))); *Boulevard*, Ballentine's Law Dictionary 168 (2nd ed. 1948) ("set apart for pleasure driving"); *Boulevard*, 11 C.J.S. 533 (1938) ("a broad city avenue specially designed for pleasure walking or driving, generally planted with trees, often in the center"); *id.* at 532 n.81(2) ("It is usually set apart for pleasure driving rather than the general business purposes of an ordinary street."); *Boulevard*, 9 C.J. 143 (1916) ("a broad city avenue specially designed for pleasure walking or driving, generally planted with trees, often in the center"); *id.* at 143 n.97 ("It is usually set apart for pleasure driving rather than the business purposes of an ordinary street.").

[6] In *Payne v. City of Galveston*, our sister court in Houston addressed a recreational activity that would have clearly satisfied the historical understanding of "pleasure driving," but the causes of action for which the city and county were held immune arose from deaths that occurred before the legislature extended the applicability of the

May 17, 1985, 69th Leg., R.S., ch. 959, § 1, 1985 Tex. Gen. Laws 3242, 3299; and then citing Act of May 26, 1995, 74th Leg., R.S., ch. 520, § 2, 1995 Tex. Gen. Laws 3276).

In 2005, however, the legislature amended the "pleasure driving" category to include "off-road motorcycling, off-road automobile driving, and the use of all-terrain vehicles" as exemplar forms. *See id.* at 53 & n.9 (citing Act of May 27, 2005, 79th Leg., R.S., ch. 932, § 1, 2005 Tex. Gen. Laws 3178); *Karl v. Brazos River Auth.*, 494 S.W.3d 168, 175 n.5 (Tex. App.—Eastland 2015, pet. denied) (Willson, J., dissenting) (observing that the legislature had amended "pleasure-driving category" to include "off-road motorcycling, off-road automobile driving, and the use of all[-]terrain vehicles"). And in *Meredith v. Chezem*, our sister court in Austin interpreted the phrase "the use of all-terrain vehicles" to characterize as "pleasure driving" the use of an ATV during an exploratory excursion on privately owned agricultural land. No. 03-18-00256-CV, 2018 WL 6425017, at *1–3 (Tex. App.—Austin Dec. 7, 2018, no pet.) (mem. op.). In so holding, the court rejected the plaintiff's argument that because the injury to his young daughter had occurred when the ATV flipped over while returning

---

Recreational Use Statute to publicly held land. 772 S.W.2d 473, 474–78 (Tex. App.—Houston [14th Dist.] 1989, writ denied) (op. on reh'g en banc) (describing the underlying fatal activity as a mother and daughter riding a rented surrey along Seawall Boulevard in Galveston only to plunge over the edge of the seawall onto the boulders below); *see City of San Antonio v. Realme*, No. 04-23-00885-CV, 2024 WL 3954217, at *3–4 (Tex. App.—San Antonio Aug. 28, 2024, pet. filed) (mem. op.) (suggesting "riding" in the rented surrey on the seawall in *Payne* was "recreation" subject to the Recreational Use Statute); *see also Citizens' Ry. Co. v. Ford*, 53 S.W. 575, 576 (Tex. 1899) (acknowledging that, depending upon the statutory context, "driving" and "riding" may describe the same activity).

from the excursion, she was not engaged in recreation at the time of the accident; the court reasoned that because returning from the excursion was incidental to the recreational excursion itself, the accident had occurred while pleasure driving. *See id.* at *3. Accordingly, the court held that the Recreational Use Statute applied to the plaintiff's causes of action and, because the jury found no gross negligence on the part of the defendant property owners, reversed the judgment awarding damages and rendered judgment that the plaintiff take nothing. *See id.* at *4. As the only Texas decision addressing this category of recreation,[7] its specific association of the phrase "the use of all-terrain vehicles" with the phrase "pleasure driving" to limit the former to purely recreational as opposed to commercial activity is consistent with the historical understanding of the latter. *See id.* at *3.

### iv. Caselaw from other jurisdictions

Decisions from other jurisdictions support this interpretation. For example, in *Umpleby v. United States*, the Eighth Circuit held that the Army Corps of Engineers was entitled to the protection of the North Dakota Recreational Use Statute, N.D. Cent. Code § 53–08–02 *et seq.*, in an action pursuant to the Federal Tort Claims Act arising from a one-vehicle accident on an access road—that was owned by the Corps and

---

[7]In *Dishon v. Lonesome Creek Resort, LLC*, the federal district court addressed a factual scenario very similar to *Meredith* involving an injury arising from the rollover of a utility terrain vehicle occurring while returning from a guided off-road excursion around a resort, but the parties appeared to assume the application of the pleasure driving category of the Recreational Use Statute; the court's findings never mention the category. No. 6:22-CV-00001-H-BU, 2024 WL 4526088, at *2–3 & *6–7 (N.D. Tex. Aug. 5, 2024).

was leased by the North Dakota Department of Game and Fish—leading from a state highway to a game management and recreation area adjacent to the Oahe Reservoir. 806 F.2d 812, 813 (8th Cir. 1986). Rendered a quadriplegic by the accident, the minor driver "was on the road because he had driven to the reservoir to rendezvous with some friends who were camping there." *Id.* at 813, 816. Observing that the definitional section of the statute defined "recreational purposes" to include both camping and pleasure driving, the court held that as a matter of law the injured teen was on the access road for recreational purposes. *Id.* at 816. In so holding, the court echoed the reasoning of the court in *Meredith.*

Similarly, in *Stine v. Nagle Corp.*, the Pennsylvania Court of Common Pleas held that four individuals—who died when they plunged down an abandoned mine shaft while four-wheeling in their sport utility vehicle in mountain woodland owned by the defendant corporation—were engaged in "pleasure driving" subject to the willful negligence standard of the Recreational Use of Land and Water Act (RULWA), 68 Pa. Stat. Ann. §§ 477–1 *et seq.*[8] 7 Pa. D. & C.4th 74, 75–79 (Com. Pl. 1990). Applying this standard, the court concluded: "Defendant's knowledge that the public used defendant's land for the recreational purpose of pleasure driving and that an

---

[8]In *Williams*, the Texas Supreme Court observed that Pennsylvania's recreational use statute "is more like our own," defining "recreational purpose" to include similar examples, and including pleasure driving. 459 S.W.3d at 56 (quoting Section 477–2(3)); *see also Friedman v. Grand Cent. Sanitation*, 571 A.2d 373 (Pa. 1990) (holding owner of landfill entitled to RULWA protection because plaintiff hunter was using landfill for hunting and was overcome by caustic fumes).

abandoned mine shaft existed on its land[] does not impute to defendant the knowledge that plaintiffs' decedents would plunge 70 feet into an unknown opening of the abandoned mine shaft." *Id.* at 79–80. Absent any evidence that the defendant corporation knew or should have known of this danger, the plaintiffs failed to meet the willful negligence burden of proof imposed by the RULWA, and the court granted summary judgment in its favor. *Id.*

Finally, in *Lauber v. Narbut*, the Superior Court of New Jersey, Appellate Division held that the driver of a Jeep and his three passengers—who crossed through property leased by the City of Millville to go "four-wheeling" up a hill—were engaged in "recreational activity" subject to the limited liability provisions of New Jersey's Landowners Liability Act, N.J.S.A. 2A:42A-2 *et seq.*, at the time they struck a steel cable suspended from wooden posts enclosing a police pistol range. 429 A.2d 1074, 1075–77 (N.J. Super. Ct. App. Div. 1981). Obtaining a judgment against the city for injuries suffered in the accident, the driver and one passenger argued that contrary to the city's interpretation of the statute, they "were merely out for a ride in the country" and were not engaged in a sport or a recreational activity.[9] *Id.* at 1076. The court rejected this characterization, observing that the evidence showed that the purpose of the excursion was to take the Jeep "four-wheeling" up and down the hills

---

[9]Although the statute defined "sport and recreational activities" to include specific examples, it did not include pleasure driving specifically, leaving the court to determine whether the excursion invoked the catchall phrase "any other outdoor sport, game, and recreational activity." *Lauber*, 429 A.2d at 1075 (quoting N.J.S.A. 2A:42A-2).

surrounding the pistol range; that the public used the area for walking, bicycling, and particularly for motorcycling and jeep-riding in the hills; and that the tire tracks across the hills showed that they had been used for "four-wheeling" purposes by motorcycles and dune buggies. *Id.* at 1076–77. Finding that the placement of the steel cable around the pistol range did not rise to the level of willful misconduct on the part of the city, the court reversed and rendered judgment for the city on immunity grounds. *Id.* at 1077.

In each of these cases, the interpreting court's analysis suggests that pleasure driving is exclusively recreational, not commercial, for purposes of limiting the liability of municipalities under a state's recreational use statute. Here, because there is no dispute that Rodriguez-Rivera was on the landfill's premises solely for the purpose of dumping a container of trash as part of his commercial activity, under the historical understanding of pleasure driving, the Recreational Use Statute does not apply.

### v. *Garner* is distinguishable

Relying on the supreme court's interpretation of the "bicycling and mountain biking" category in *Garner*, however, the City argues that Rodriguez-Rivera's commercial purpose in seeking to dump his container of trash at the landfill is irrelevant to the application of the Recreational Use Statute to his causes of action; all that matters, according to the City, is that he was driving his automobile "off-road" on City property at the time of the accident. But the reason that the *Garner* court held that the plaintiff's intent in bicycling on university-owned property was not relevant to

28

the statute's application was that the legislature had defined "bicycling" to constitute "recreation" without qualification. *See* 595 S.W.3d at 650–51 & n.4 (observing that Section 75.002(f) does not include language qualifying its application by the recreational intent of the user when entering the premises). By including "off-road automobile driving" within the existing "pleasure driving" category, the legislature expressly qualified and associated the former phrase with the well-established meaning of the latter and thereby excluded commercial purposes from its application.[10]

We agree with the reasoning of Justice Schenck, dissenting in *Nelson v. City of Plano*, suggesting it unlikely that the legislature intended by its use of the adjective "pleasure" to modify "driving" to include "general transportation uses" such as commercial activity within its ambit:

> While the City accepts that "pleasure" driving indicates an intention to focus on the particular subjective intended use of property, it reads that purpose as evident only with respect to driving, suggesting the lack of the modifier "pleasure" implies a different legislative intent with respect

---

[10]Even if recreational intent mattered when applied to bicycling, the circumstances giving rise to the injury in *Garner* are easily distinguishable from those in this case. In *Garner*, the plaintiff was traveling by bicycle to a trail head in a park where she planned to meet a friend to "ride the trail." *See* 595 S.W.3d at 648. To reach the trail, she used a road within the university-owned apartment complex. *See id.* at 647. Applying reasoning similar to *Meredith*, the supreme court held that the bicyclist's going to—and returning from—a recreational use of a premises is incidental to and included within the recreational use itself. *See id.* at 650 n.4 ("To the extent Garner argues she was bicycling on [the university-owned street] for transportation rather than recreational purposes, her subjective intent does not control. Under the statute's plain language, bicycling is recreation." (citations omitted)). Here, the City does not dispute that Rodriguez-Rivera was on its landfill premises for purely commercial purposes, both coming and going; pleasure, whether subjectively understood or objectively determined, had nothing to do with this activity.

to bicycles. I disagree. Having already constrained the reach of the entire rule to "recreation," there would have been no need of further textual modification with respect to either mode of transportation. If anything, declaring "pleasure" driving to be within the possible recreational uses of another's property seems more consistent with the idea that general transportation uses of the public right of way were generally outside of the legislature's intended sweep, regardless of the mode that might be involved.

No. 05-21-00708-CV, 2022 WL 17075883, at *6 (Tex. App.—Dallas Nov. 18, 2022, pet. denied) (mem. op.) (Schenck, J., dissenting). And there is nothing in its inclusion of "off-road automobile driving" as an example *within* the pleasure-driving category to suggest its *extension* to "general transportation uses" merely because they occur off-road.

Indeed, such an interpretation would be the proverbial exception that eats the rule, transforming all off-road automobile driving into recreation whether pursued for pleasure or not. *See Sullivan*, 2011 WL 1902018, at *2 (observing that statutory language should be interpreted according to the plain meaning of its words unless a contrary intention is evident from the context, or unless such an interpretation leads to an absurd result). As examples, a ranch hand injured while driving a truckload of hay out to a herd of cattle, a welder injured driving a welding rig truck out to a gas well, or an airline employee injured driving a baggage carrier to a taxiing jet would all

30

be engaged in recreation by merely driving off road. We decline to ascribe such meaning to the phrase.[11]

## IV. Conclusion

Interpreting Section 75.001(3)(H) to exclude commercial activity from its application, we hold that Rodriguez-Rivera was not engaged in "pleasure driving" as a category of "recreation" when he was injured by the backing bulldozer while he waited to dump his container of trash at the City's landfill. Mere "off-road automobile driving" without recreational intent does not invoke the limitations of liability imposed by the Recreational Use Act. Absent the heightened jurisdictional standard established by the statute, Rodriguez-Rivera both pleaded and proved a waiver of the City's governmental immunity under the Tort Claims Act. Accordingly, we overrule the City's sole issue, and we affirm the trial court's denial of the City's plea to the jurisdiction.

---

[11]Alternatively, the City argues that had the legislature intended to exclude commercial activity from the application of the statute, it would have created an exception expressly excluding users engaged in recreational activities while working. Offering "professional fishers, swimmers, rock-climbers, bikers, etc." as examples, the City suggests our interpretation would lead to the absurd result of limiting the statute's application to amateurs. But the legislature was clearly aware that individuals engage in recreational activities for many reasons—including for a living and by assisting others professionally in such activities—and intentionally declined to create such an amateur–professional distinction. *See Sullivan*, 2011 WL 1902018, at *5 (observing that interpreting statutory language requires ascertaining and giving effect to the legislature's intent). It is the historical context of the phrase "pleasure driving" that is determinative under these circumstances, leaving for another day the question of pleasure driving as a professional service or commercial enterprise, necessarily intertwined with the recreational activity of others.

31

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered: February 6, 2025